H. H. TOLAND, APPELLANT, *v.* SOLOMON MANDELL, RESPONDENT.

STATE SELECTIONS UPON UNSURVEYED PUBLIC LANDS CONFIRMED.—The holders of State selections, made upon public lands not then surveyed by authority of the United States, under the Act of Congress of the 23d of July, 1866, to quiet land titles in California, have acquired the rights of a pre-emptioner upon unsurveyed public land, if their selections have been surveyed and marked off, and designated in the field, and bought, in good faith, under the laws of the State, unless, at the date of that Act, some pre-emption, homestead, or other right, under the laws of the United States, had attached to the land, or the land was within some reservation.

EFFECT OF THE ACT OF CONGRESS OF THE 23D OF JULY, 1866, UPON STATE LOCA-TIONS.—It had the effect to legalize the possession of locators upon unsurveyed lands, until they have an opportunity to present their claims for determination by the officers of the United States, as therein provided, and to enable them to maintain actions in the Courts, in relation thereto.

IDEM.—Under the Act of Congress of the 23d of July, 1866, the holder of a State location upon unsurveyed public land, bought by him in good faith, under State laws, may maintain ejectment, if ousted.

"LAND SOLD IN GOOD FAITH"—MEANING OF.—By the words "sold to purchasers in good faith, under the laws of the State," occurring in the Act of Congress of the 23d of July, 1866, is meant such selections as have been made according to the conditions of the State laws under which they purport to have been made, and which have been sold in a manner which would have passed the title, had it then been in the State.

BURDEN OF PROOF IN AN ACTION TO RECOVER A STATE SELECTION.—The holder of a State selection upon unsurveyed public land, in an action to recover the possession, makes a *prima facie* case by exhibiting a certificate of purchase from the State. If the land be within any of the exceptions stated in the Act of Congress, the burden of proof is upon the defendant.

APPEAL from the District Court of the Seventh Judicial District, Solano County.

The plaintiff appealed.

The case is stated in the opinion of the Court.

*Wm. S. Wells* and *Williams & Thornton*, for Appellant.

*M. A. Wheaton*, for Respondent.

SANDERSON, J., delivered the opinion of the Court:

This is an action of ejectment. At the trial the plaintiff relied for a recovery upon a certificate of purchase from the State of California to one B. F. Lee, issued under the provisions of the statutes of this State in relation to the location and sale of lands donated by the United States to the State for internal improvements and other purposes (Stats. 1858, p. 248; 1859, p. 33; 1861, p. 218), dated November 12, 1861, and duly assigned to him on the 3d day of December, 1861, accompanied by proof of possession under it. As appeared upon its face, the certificate was for *unsurveyed* lands. The Court below nonsuited the plaintiff, upon the ground that the certificate conveyed neither title, nor right of possession.

In *Grogan* v. *Knight* (27 Cal. 515), we held a similar certificate ineffectual for any purpose; but since that case Congress has passed an Act to quiet land titles in this State (U. S. Stats. at Large, 1865–6, p. 218), which the plaintiff claims has had the effect to confirm to the State his, and other like selections, thus rendering it valid, and vesting in him the title of the United States to the land in question; or, if not the title, that it has vested in him all the rights of a pre-emptioner upon unsurveyed lands, under the pre-emption laws of the United States, among which, the plaintiff further claims, is the right to be maintained in his possession by the Courts.

The first section of the Act of Congress of the 23d of July, 1866, provides, " that in all cases where the State of California has heretofore made selections of any portion of the public domain, in part satisfaction of any grant made to said State by any Act of Congress, and has disposed of the same to purchasers *in good faith, under her laws,* the lands so selected shall be, and hereby are, confirmed to said State; *provided,* that no selection made by said State, *contrary to existing laws,* shall be confirmed by this Act, for lands to which any adverse pre-emption, homestead, or other right has, at the date of the passage of this Act, been acquired by

any settler, under the laws of the United States, or to any which have been reserved for naval, military or Indian purposes by the United States, or to any mineral land, or to any land held or claimed under any valid Mexican or Spanish grant, or to any land which, at the time of the passage of this Act, was included within the limits of any city, town or village, or within the County of San Francisco; *and provided, further,* that the State of California shall not receive, under this Act, a greater quantity of land for school or improvement purposes than she is entitled to by law."

The second section relates to selections which have been made by the State upon *surveyed* lands. It makes it the duty of the "proper authorities of the State," when the same has not already been done, to notify the Register of the United States Land Office for the district in which the land is located, of such selections, and provides that such notice shall be taken as the date of the selection by the State, and that the several local Registers, after investigation and decision by them, shall forward all such selections to the Commissioner of the General Land Office, who, if he finds them to be in accordance with Section 1 of this Act, is directed to certify them over to the State in the usual manner.

The third section relates to selections which have been made upon *unsurveyed* lands, and has a direct bearing upon the facts of the present case. We therefore quote it in full. It is as follows: "That where the selections named in Section 1 of this Act have been made from lands which have not been surveyed by authority of the United States, but which selections have been surveyed by authority of, and under the laws of said State, *and the land sold to purchasers in good faith under the laws of the State,* such selections shall, *from the date of the passage of this Act, when marked off and designated in the field,* have the same force and effect as the preemption rights of a settler upon unsurveyed public land; and if, upon survey of such lands by the United States, the lines of the two surveys shall be found not to agree, the selection shall be so changed as to include those legal subdivisions which nearest conform to the identical land included in the *State* survey and selection. Upon the filing with the

Register of the proper United States Land Office of the township plat in which any such selection of unsurveyed land is located, the holder of the State title shall be allowed the same time to present and prove up his purchase and claim under this Act as is allowed pre-emptors under existing laws; and if found in accordance with Section 1 of this Act, the land embraced therein shall be certified over to the State by the Commissioner of the General Land Office."

The remaining sections of the Act have no direct application to the facts of the present case, nor is a reference to their provisions needed for the purpose of interpreting what has already been given.

Upon its face, the Act purports to remedy certain evils which had resulted from an attempt on the part of the State to make the lands donated to her for internal improvements and other purposes, available in advance of a survey made by authority of the United States, which, as this Court has had occasion to determine, could not be done consistently with the system which the United States had adopted for the purpose of disposing of the public domain to the States, and to actual settlers. (*Terry* v. *Megerle,* 24 Cal. 609; *Grogan* v. *Knight,* 27 *Id.* 517.) A brief reference to what had been done in that respect by the State will assist us to understand the object which Congress had in view, and also to ascertain what was intended to be effected by the passage of the Act in question.

The lands which have been donated to the State by the United States, are : First—Five hundred thousand acres, for purposes of internal improvements, granted by the eighth section of the Act of September 4, 1841, "to appropriate the proceeds of the sales of the public lands, and to grant pre-emption rights." Second—All the swamp and overflowed lands in the State, under the Act of September 28, 1850, "to enable Arkansas, and other States, to reclaim the swamp lands within their limits." Third—The sixteenth and thirty-sixth sections in each township, for the use of public schools therein ; two entire townships, or seventy-two sections, for the use of a seminary of learning ; and ten entire sections, for the purpose of erecting public buildings, under the sixth, twelfth and thir-

teenth sections, respectively, of the Act of the 3d of March, 1853, "to provide for the survey of the public land in California, the granting of pre-emption rights therein, and for other purposes." And, Fourth — One hundred and fifty thousand acres for an agricultural college, under the Act of the 2d of July, 1862, "donating public lands to the several States and Territories which may provide colleges for the benefit of agriculture and the mechanic arts."

Of these donations, the second and last only are unaffected by the legislation of the State to which we are about to refer.

Under these donations the State acquired no title to any specific land, and could not, until after the public land had been surveyed by authority of the United States; for, in respect to some of them, Congress had expressly provided that no selections should be made by the State until after the public land had been surveyed, under existing laws of Congress; and, in respect to the others, a like prohibition was necessarily implied by the manner prescribed for their selection in the Acts by which they were donated, and also by the conditions of the general plan and system which Congress had adopted for the disposition of the public domain—of which system a survey and division of the land into townships, sections, and quarter-sections was the preliminary and indispensable step. Yet, without a survey having been made by authority of the United States, and without any consent or concurrent action on the part of the Land Department of the National Government, the Legislature of this State, impatient at the delay of Congress in providing for the survey of the public domain in this State, and granting pre-emption rights, which was not done until nearly three years after the State had been admitted into the Union, proceeded, as early as the 3d of May, 1852 (Stats. 1852, p. 41), to select the lands donated for internal improvements by the eighth section of the Act of September 4, 1841, and diverted, by the second section of the IXth Article of the Constitution of the State, to the support of common schools, and, to that end, authorized the Governor to issue land warrants for not less than one hundred and sixty nor more than three hundred and twenty acres in one warrant, to the full number of acres

included in the donation. These warrants, the Treasurer was authorized to sell at the rate of two dollars per acre. No person was permitted to purchase warrants for more than six hundred and forty acres, or a section of land according to United States surveys, and, before purchasing, he was required to file an affidavit with the Controller of the State to the effect that he desired to purchase the land for the purpose of making a permanent settlement thereon. Purchasers and their assigns were authorized, in behalf of the State, or as her agents, to locate their warrants upon any vacant and unappropriated public land in the State, not included within the limits of any town then laid off, but were required to locate not less than three hundred and twenty acres in a body, in conformity with a condition to that effect contained in the Act of Congress by which the lands sought to be selected were donated. The locations were required to be surveyed by the County Surveyors so as to match, as near as possible, the lines of the United States survey when the same should come to be made, and the purchaser was to be secured in the possession of his land until such time as it should be surveyed by authority of the United States; after which time his lines were to be shifted, if necessary, so as to conform to the lines of the United States survey.

In 1855, the Legislature passed another Act (Stats. 1855, p. 281), by which it undertook the selection of the *unsold* portion of the donation for internal improvements, and also the ten sections donated for public buildings, and the sixteenth and thirty-sixth sections in each township, donated for the use of common schools. By this Act, the Surveyor General of the State was made the agent of the State, for the purpose of making selections. He was required to make the selections "as soon as practicable after the lands had been surveyed by the United States, or sooner, *if allowed by the laws of the United States,*" from which provision it would seem that the Legislature had already begun to doubt the validity of the selections which it had authorized to be made by the Act of 1852, which doubt seems to have become strengthened in 1857, at which time another Act was passed, providing for the location and patenting of school lands

(Stats. 1857, p. 356), in which, for the first time, the Legislature adopted a course not altogether inconsistent with the regulations of the Land Department of the United States Government. It provided that the owners of school land warrants which had been issued under the Act of 1852, might locate them in all cases in which the lands of the United States had been duly surveyed by the General Government, and the plat thereof filed for thirty days in the Land Office of the proper district, by filing a written application with the Register for the district, and making affidavit that there was no valid adverse claim, and that, whenever the General Government should certify the land over to the State, the Governor of the State should issue a patent therefor, upon the production of the evidence therein required.

In 1858, the Legislature passed still another Act to provide for the location and sale of the unsold portion of the school lands, and also the seventy-two sections donated for the use of a seminary of learning (Stats. 1858, p. 248), by which the Governor was authorized to appoint and commission one suitable and competent person in each United States Land District, whose duty it should be to act as the Locating Agent of the State in his district. Under this Act, locations were to be made, upon application by the State Agent to the Land Office of the United States for the district in which the land was situated, and in conformity to the laws and regulations of the United States. The agents were prohibited from locating, directly or indirectly, more than three hundred and twenty acres for any one person. The persons for whom locations were made were entitled to certificates of purchase, and each agent was required to keep a register of all locations made by him, and furnish a copy thereof to the Register of the State Land Office.

In the same year, an Act was also passed to provide for the sale of the sixteenth and thirty-sixth sections, or lands selected in lieu thereof. (Stats. 1858, p. 318.) The sales were to be made by the Sheriff of the county, upon the order of the Board of Supervisors, who were to act upon the petition of a majority of the householders of the township. The

purchasers were to receive certificates of purchase from the Sheriff, and, finally, a patent from the State.

In 1859, another Act, amendatory and supplemental to the second preceding Act, was passed, extending the provisions of the latter to the location and sale of the ten sections donated for public buildings. (Stats. 1859, p. 33.)

In the same year, a further Act was passed, directly authorizing persons holding school land warrants to locate them upon any *unsurveyed* lands of the United States subject to such location. The locator was required to file with the County Surveyor of the county in which the land was situated an affidavit to the effect that there was no adverse claim or title, and that the land was subject to location under the provisions of the Act of Congress by which the lands for internal improvements were granted. Thereupon, the County Surveyor was required to make the location, and accurately describe the land by township, range, section and parts of sections, after the method of the United States surveys, and report his proceedings fully to the Surveyor General of the State, who was required to examine the location, and if found correct, or not in conflict with other locations, as shown by the records of his office, to notify the Register and Receiver of the United States Land Office, for the district in which the land was situated, that the State had selected the same in part satisfaction of the donation for internal improvements. If he approved the location, the Surveyor General was required to endorse the warrant to that effect, and deliver it to the Register of the State Land Office, who was required to cancel it, and deliver to the locator a certificate of purchase. It was further provided, that locations so made should be deemed as valid as if they had been made upon *surveyed* lands, and that patents therefor might be obtained in the same manner as for *surveyed* lands. (Stats. 1859, p. 301.)

In 1861, another Act was passed (Stats. 1861, p. 218), amendatory and supplemental to the Act of 1858, which provided for the selection of the unsold portion of the internal improvement and seminary lands, and the Act amendatory thereof, of 1859. By it, each Locating Agent was required to obtain from the United States Registers of their respective

districts a list of the sixteenth and thirty-sixth sections in full townships, and the fractions of such sections, in fractional townships, which had not previously been sold to preemptors, and, also, a list of such as had been sold; also, a list of such lands as had been reserved, or were covered by private grants, and for which the State was entitled to select other lands in lieu thereof; and, also, a list of the lands sold under the Act of 1858, for the sale of the sixteenth and thirty-sixth sections. Thereupon, it was further provided that the lands thus listed to the State should be located and sold in all respects in the same manner as provided in the Act of 1858 and 1859, to which the Act in question was amendatory and supplemental. Unsurveyed sixteenth and thirty-sixth sections and fractional sections, and unsurveyed lands in lieu thereof, were to be located and sold in the same manner, except the application to locate must be accompanied by a map and field-notes of the land sought to be purchased, surveyed in accordance with the United States surveys, by the County Surveyor of the county in which the land should be situated. The Locating Agents were to report locations to the Surveyor General if the United States Register should fail to certify the same over to the State within thirty days, who, upon finding the location to have been properly made, was required, after the expiration of sixty days, to approve the location and return a certificate thereof, with his approval endorsed thereon, and an order for the payment of principal or interest, according to circumstances; and, upon payment thereof, it was provided that the locator should receive a certificate of purchase.

During the same period, similar statutes were passed in relation to swamp lands. The land in suit, however, does not belong to that class, and the legislation already referred to sufficiently indicates what has been the policy of the State in relation to the location and sale of the lands donated to her by the General Government.

Thus it appears that the plan adopted by the State for the purpose of selecting and selling her lands has not been consistent or harmonious in itself. First—The purchasers of school warrants were authorized to act as the agents of the

State in the matter of selecting her lands, and to make selection by the assistance of County Surveyors and Clerks. Second—The Surveyor General of the State was authorized to act as Locating Agent of the State, assisted, when called upon by him, by the County Surveyors. Third—Holders of school warrants were again authorized to act as agents in locating their warrants upon *surveyed* lands. Fourth—The Governor was authorized to appoint a Commissioner for each United States Land District, to act as Locating Agent of the State in such district. Fifth—Persons holding school warrants were authorized to act as agents in locating their warrants upon *unsurveyed* lands. So there have been three classes of Locating Agents : First, purchasers of school warrants ; second, the Surveyor General of the State ; third, Commissioners appointed by the Governor—one for each United States Land District; all of whom could, for aught we have been able to discover, be engaged in the work at the same time. To the proceedings of each, however, were annexed certain conditions, among which were : First—Not more than six hundred and forty acres could be sold to the same person, by the Act of 1852, and not more than half that number could be located for any one person under the Act of 1858. Second—Not less than three hundred and twenty acres could be located in a body. Third—The locator must make an affidavit that he wanted the land for the purpose of making a permanent settlement thereon. Fourth—The land must be vacant, or the locator must make affidavit that there was no adverse claimant. Fifth—In the case of *unsurveyed* lands, the land must be surveyed and marked off by distances, lines and courses, or posts. Sixth—Each purchaser was to receive a certificate of purchase, which should be *prima facie* evidence of title. (Stats. 1859, p. 227.)

From the foregoing reference to the land laws of the State, upon which the plaintiff's claim is founded, in part, it is manifest that it has been the policy of the State, from 1852 down to the last legislation upon the subject, had prior to the date of plaintiff's certificate of purchase, to select and sell all the lands donated to her for improvements, common

schools, public buildings and a seminary, without waiting for the General Government to survey, and otherwise prepare them for selection and segregation, according to the methods of the United States. As might have been supposed, the steps so taken by the State were never recognized, as of any legal effect, by the Land Department of the United States, and the State found herself in a sea of difficulties, by her improvident legislation, from which she could be extricated in only one of two modes : by retracing her steps and calling in all her warrants, and making compensation to purchasers, or by prevailing upon Congress to ratify and confirm the selections which she had made.

In 1863 the Legislature chose the latter plan, by adopting the following preamble and resolution :

"Whereas, The State of California, through her officers, properly authorized by law, has made selections of land from the public domain, in part satisfaction of the various donations made to the State by Acts of Congress ; and, whereas, the State has made sales of the lands so selected to purchasers, in good faith, received partial or whole payments therefor, and has issued certificates of purchase, or patents, to such purchasers for the lands so selected, thereby pledging her honor for the procurement of good and sufficient titles for the same ; and, whereas, the Hon. Commissioner of the General Land Office, at Washington, giving a different construction to some of said laws of donation from that entertained by the authorities of the State, has decided many such selections to have been improperly made ; be it, therefore,

"*Resolved*, By the Senate, the Assembly concurring, that our Senators and Representatives in Congress are hereby requested to procure the passage of a law which shall provide that wherever the proper authorities of the State have, in good faith, selected any portion of the public domain, in part satisfaction of any grant made to the State by any Act of Congress, and have sold the same in good faith, the said selections shall be confirmed to the State ; and the State hereby pledges herself that if, upon final investigation and decision, it shall appear that the State has selected any lands to which she is not entitled, she shall pay into the Sub-Treasury of the United States, at San Francisco, to the credit of the United States, the sum of one dollar and twenty-five cents for each and every acre of land so determined to have been improperly selected."

Thus the plan devised by the Legislature to extricate the State from the difficulties in which she had become involved, was to obtain from Congress a confirmation of her pretended title to all lands which she had *selected and sold*, in good faith, under her laws, regardless of the fact whether she had selected lands which were not open to her selection, or which she was not entitled to select; proposing, however, to pay for the latter at the Government price—if there should turn out to be any of that class—upon final investigation and decision.

It was in compliance with this request of the Legislature, that the Act of Congress of the 23d of July, 1866, to quiet land titles in California, upon which the plaintiff relies, was passed. It does not concede to the State all that was asked by the Legislature. The full prayer of the Legislature could not have been granted by Congress without a total disregard of conflicting claims, and, possibly, without an interference with vested rights. So far, however, as the State and purchasers, under her laws, could be relieved, without impairing the rights of settlers upon the public land, under the laws of the United States, previously acquired or then existing, Congress has undertaken to go, and no farther.

The Act does not confirm to the State all the lands which may have been selected by her, but only such as had been *selected* and *sold* to purchasers, *in good faith*, under her laws; and such selections, even, are not confirmed, if, at the date of the passage of the Act (23d July, 1866) there had attached to the land any pre-emption, homestead or other right in favor of any settler, under the laws of the United States, or if the land was within any naval, military or Indian reservation, or mineral, or claimed under a Mexican or Spanish title, or within the limits of any city, town or village, or the County of San Francisco, or in excess of the quantity of land to which the State is entitled for improvement and school purposes under existing laws. It does not confirm to the State any specific land, or finally validate any particular section; for it reserves to the General Government the right to inquire, as to each selection, and determine whether it has been made, and the land sold to purchasers,

in good faith, under the laws of the State, and whether the
land falls within any of the exceptions stated in the first
section.   The effect of the Act upon State selections, is, in
the main, similar to the effect of the Congressional donations
upon the land.   For example, under the eighth section of
the Act of September, 1841, donating five hundred thousand
acres for internal improvements, the State, upon her admis-
sion into the Union, became vested with the title to so much
of the public domain within her limits—but she became
vested with the title to no specific land.   That could not
happen until after a survey, and a selection, approved by the
General Government.   So this Act, confirming selections
made by her, contrary to the laws of the United States,
does not vest in her the title to any specific selection.
That cannot happen until after the selection has come before
the proper officers of the General Government, and, after
examination, has been declared by them of the character
described in Section 1—that is to say, not within any of
the exceptions there stated—and that the land has been
sold to purchasers, in good faith, under the laws of the
State; by which latter description, we understand, is meant
such selections as have been made according to the con-
ditions of the State laws, under which they purport to have
been made, and have been sold to purchasers in such manner
as would have passed the State's title, at the time the selec-
tion was made, if the State had then had a title..  In effect,
the Act amounts to nothing more than a direction to the
Land Department of the General Government to recognize
and approve such selections as had been made by the State,
under her laws, and contrary to existing laws of the United
States, so far as they may appear, upon examination, to have
been made upon lands which, at the dates thereinafter pro-
vided, were open to selection by her; or, in other words,
not included in any of the exceptions enumerated in the first
section.   To this effect the first section is necessarily limited
by the succeeding sections.   The second section provides
that the State, through her officers, shall notify the Regis-
ters of the United States Land Offices of all selections which
have been made by her upon surveyed lands in their respec-

tive districts. The selection is made to date from the date of such notice; and if, at that date, there is no valid objection to it, under the first section, the selection is to be allowed; or, in other words, confirmed—and not otherwise. So in the third section. Selections made upon unsurveyed lands, are not absolutely confirmed to the State; but if they have been surveyed by authority of the State, and sold to purchasers, in good faith, under her laws, and are marked off and designated in the field, they are allowed the same force and effect as pre-emption rights upon unsurveyed land; provided, always, they do not, upon investigation by the proper officers of the United States, fall within any of the exceptions stated in Section 1 of that Act.

The Act, nevertheless, had the effect to legalize the possession of locators upon unsurveyed lands under the State, until they should have an opportunity to present their claims for determination by the officers of the United States, as therein provided. Thereafter their claims ceased to be within the rule of *Grogan* v. *Knight (supra)*, for they were, by the Act, admitted to all the rights and privileges of pre-emptors upon unsurveyed lands, under the laws of the United States, which are comprised in the right of present possession, coupled with the right to purchase the title whenever the time at which a purchase can be effected shall have arrived. The pre-emptors' right, aside from personal qualifications, is founded upon an inhabitation and improvement of the land, which necessarily implies a license, or right to enter for that purpose. All persons possessing the personal qualifications of a pre-emptor may, therefore, lawfully enter upon and take possession of the public domain with a view to the acquisition of the title, upon the performance by them of the conditions prescribed by the Government. Having settled, in person upon the land, improved it, and erected a dwelling house thereon, they are lawfully in possession, and have a right to be protected in it; and, if ousted, may sue to recover it. To maintain ejectment, a right of entry and possession is all that is required. (*Payne* v. *Treadwell,* 5 Cal. 310; *Yount* v. *Howell,* 14 *Id.* 468; *Grady* v. *Early,* 18 *Id.* 108; *Hubbard* v. *Barry,* 21 *Id.* 321; *Bullock* v. *Wilson,* 2 Porter,

Ala. 437; *Masters* v. *Eustis*, 3 *Id.* 371; *Goodlet* v. *Smithson*, 5 *Id.* 245.) A contrary doctrine would tend to defeat the policy in view of which pre-emption rights were conceived, by putting the settlement and improvement of the pre-emptioner at the mercy of any stranger who might chose to trespass upon them.

The only question yet undetermined relates to the proof which a locator under the State upon unsurveyed lands must make to enable him to recover as against an intruder upon his possession. He must undoubtedly bring himself within the conditions of the Act of Congress in question. He must show that he is a purchaser in good faith under the State. Of these facts, however, his certificate of purchase is *prima facie* evidence, for it has been so declared by a statute of the State. It shows that the State has selected the land, and sold it to a purchaser, and that he has made a payment thereon—that, as against the State, he has acquired an inchoate title, one which the State is bound to perfect under her laws, thus satisfying, so far, the conditions of the first section of the Act of Congress. If the land falls within any of the exceptions there stated, the defendant must prove it.

Judgment reversed, and a new trial ordered.

Mr. Justice RHODES dissented, but delivered no opinion.