[Civ. No. 1675. Third Appellate District.—September 30, 1919.]

JOSEPH ROSENBERG et al., Executors, etc., Appellants, v. CHARLES A. BUMP, Respondent.

[1] School Lands—Grant to State by Congress—Locations and Patents—Act of 1852 not Repealed.—The act of 1857 (Stats. 1857, p. 356), authorizing the location and patenting of school lands, did not repeal the act of 1852 (Stats. 1852, p. 41), which provided for the disposal of the five hundred thousand acres of land granted by Congress to the state of California, either expressly or necessarily from the general language thereof. To the contrary, the act of 1857 made certain portions of the act of 1852

a part of its own provisions, or, if it strictly cannot be said that this is true, it certainly and unquestionably recognized by express language the validity of the warrants issued under the prior act, the sale of such warrants and the rights acquired by purchasers of the same.

[2] ID.—PURPOSE OF ACT OF 1857.—The legislature by the act of 1857 merely intended to regulate the matter of locating warrants issued by the state and acquired by purchasers under the act of 1852, so that such locations would conform to the requirements of the United States statutes relative thereto.

[3] ID.—RESERVATION CLAUSE IN ACT OF 1858—RIGHTS OF PURCHASERS UNDER EARLIER ACT.—While the act of 1858 (Stats. 1858, p. 248) did expressly repeal, among others, the statute of 1852, it contained the express provision that "all school-land warrants, now in circulation, shall be received for school lands, and may be located as now provided by law." The meaning of this language is that school-land warrants in circulation at the time of the passage of the act of 1858 may be located as provided by the law existing at the time of the passage of said act, or as provided by the law authorizing the issuing and sale of such warrants.

[4] ID.—CONSTRUCTION OF ACT OF 1868—RIGHT TO LOCATE WARRANTS.— The legislature did not intend by the act of 1868 (Stats. 1867–68, p. 507), providing a new and different procedure for obtaining patents to the unlocated portions of the five hundred thousand acres of land set apart as school land, to vest solely and exclusively in the surveyor-general the right to make school-land warrant selections. The sale of the warrant constituted a sale by the state of the number of acres of land specified in the warrant, a sale of the land so specified for all time and unconditionally, and there was nothing remaining for the purchaser to do but to locate the number of acres his warrant called for. Having bought and paid for the land, there was no reason why his warrant should be presented to the surveyor-general as in payment for something he had already paid for.

[5] ID.—RIGHT OF SURVEYOR-GENERAL TO LOCATE LANDS.—The act of 1868 expressly limits the right of the surveyor-general to locate lands comprised within the grant by Congress to the unsold portions thereof, and it was not the intent of the legislature by such act to deprive owners of pre-existing land warrants of the right themselves to locate said warrants as agents of the state.

[6] ID.—OWNERSHIP OF OUTSTANDING WARRANTS—ADDITIONAL PER- MISSIVE RIGHT UNDER ACT OF 1868.—The provision of the act of 1868 that outstanding warrants shall be taken in payment of any part of the grant was intended only to be permissive—that is to say, that it was intended to confer upon owners of outstanding warrants the right, in addition to their pre-existing right to locate

the warrants as agents of the state, to present the same as payment on applications to purchase lands embraced within the congressional grant.

[7] ID.—EFFECT OF SAVING CLAUSE OF ACT OF 1868.—By the saving clause of the act of 1868, the legislature intended to preserve to the purchasers of warrants issued and sold under the act of 1852 all the rights acquired by them by virtue of such warrants.

[8] ID.—VESTED RIGHT OF PURCHASER.—The purchasers of school-land warrants issued and sold under the statutes of 1852 and 1853 acquired under such purchase a vested right to the amount of land specified in the warrants.

[9] ID.—SALE OF WARRANTS—CONTRACT WITH STATE—NATURE OF.—The sale of school-land warrants by the state constituted a contract between the state and the purchasers of the warrants, although at the time of the sale the lands granted by Congress had not been listed to the state. The terms of the warrant were that the purchaser was entitled to locate the same in behalf of the state of California. The warrant constituted a contract of sale of the amount of land specified therein and which land was embraced within the grant to the state by Congress of five hundred thousand acres of land.

[10] ID.—RIGHT TO LOCATE WARRANTS—POWER OF LEGISLATURE TO AMEND PROCEDURE.—While the legislature may amend the procedure or change the remedy whereby rights are judicially asserted, and such amendment or change may have a retroactive effect, except in those cases where the procedure or the remedy as amended or changed directly affects and impairs the right, the legislature is without the power to take away the right of the purchasers of school-land warrants to locate such warrants.

[11] ID.—DELAY IN LOCATING WARRANTS.—As there was no time limit fixed by the statute of 1852 within which the locations were to be made, no rights could accrue to the state by reason of the delay in locating the warrants, it having been fully paid for the amount of land specified therein.

APPEAL from a judgment of the Superior Court of Monterey County. B. V. Sargent, Judge. Reversed.

The facts are stated in the opinion of the court.

M. W. McIntosh and Isaac Frohman for Appellants.

Leon Samuels for Respondent.

HART, J.—The action was brought in the superior court of Monterey County, under sections 3414 and 3415 of the

Political Code, to determine the title of certain lands in said county. Defendant had judgment, from which plaintiffs appeal on the judgment-roll.

Plaintiffs claim title to the south half of a certain section 13 and the fractional north half of a certain section 19, while the claim of defendant is to said south half of section 13 and the fractional northwest quarter and the west half of the northeast quarter of said section 19.

The claim of plaintiffs is based upon the following facts: By a certain act of Congress, five hundred thousand acres of land were granted to the state of California and, pursuant to an act of the legislature, approved May 3, 1852 (Stats. 1852, p. 41), land warrants were signed and issued by the Governor of the state, countersigned by the controller, deposited in the office of the state treasurer and thereafter sold. Between the second day of July, 1852, and the first day of October, 1853, four of said land warrants were issued and sold to different purchasers, each for the amount of 160 acres, and paid for at the rate of two dollars per acre. On the twentieth day of October, 1893, one Henry Jackson, who had by mesne assignments become the owner of said four land warrants, located the same on the lands claimed by plaintiffs and, on the 24th of August, 1900, said locations were approved and allowed by the commissioner of the general land office. Said Jackson, on the eighth day of February, 1901, by deed, conveyed said lands to one M. Brandenstein, who died testate on the 25th of March, 1906. His will was duly admitted to probate and plaintiffs were appointed as executors thereof and qualified as such.

On the seventh day of November, 1911, defendant filed with the surveyor-general of the state his application to purchase all of the lands claimed by plaintiffs, except the east half of the northeast quarter of said section 19.

There is no denial by the answer of or any dispute in any form as to these facts, which are alleged in the complaint, quoting from the reply brief as follows: "That on October 20, 1893, the day on which the locations were made, the lands involved were vacant and unappropriated lands of the United States and subject to sale and location at the United States land office at San Francisco; that they had been surveyed by the United States; that the plats of the survey had been approved and certified by the United States Surveyor-general

for the state of California and filed more than thirty days prior to October 20, 1893, in said land office; that Jackson, who was then the owner of the land warrants, located them on said lands conformably to the said survey; that he made the locations by filing with the register of said land office his written applications for said lands, specifically describing the same in the applications; that the applications were each accompanied by the affidavits of Jackson and at least one witness that there was no valid adverse claim existing upon any of said lands; that he surrendered the warrants to the register of the United States land office, who forwarded them to the general land office of the United States; that the locations were made with the consent of the register and receiver of the United States land office at San Francisco, and entered by them on the records of said office; that on August 24, 1900, the locations were approved and allowed by the commissioner of the general land office; that on January 23, 1901, the lands were certified and listed to the state by the United States as a part of the five hundred thousand acre grant to the state; that said certificates and listing of said lands was made under and in pursuance of said locations and not otherwise.''

The answer, so far as its denials go, does no more than to challenge the allegations of the complaint that Jackson had conveyed the lands to Brandenstein, and that the latter, or the executors of his will, had any legal or equitable title to the lands or were the owners of any portion thereof. Affirmatively, the answer then declares that the act of 1852, under the terms of which the warrants in question were issued and sold to Jackson or his grantors, was repealed by the act of 1868, and that, therefore (so the answer concludes), at the time the locations were made by Jackson under said warrants ''there was no law of said state whatever providing for the making of said locations,'' and that the locations were consequently null and void and conveyed no title or right or estate whatever to said Henry Jackson.

The court found that Brandenstein and his executors, ever since the date of the deed from Henry Jackson to the former, had been in the possession of said lands; that it is not true that M. Brandenstein and his executors have ever at any time been the owners of said lands or any part thereof; that, on the 28th of March, 1868 (Stats. 1867–68, p. 507), the legis-

lature of the state of California repealed the act of May 3, 1852, and "that at the time the said locations made by said Jackson were made, there was no law of said state whatever providing for the making of said locations, and said locations were, at the time the same were made, ever since have been, and now are, null and void, and conveyed no right or title or estate whatever to said Henry Jackson, and that said Henry Jackson did not at the time said locations were made, acquire, hold, or have, nor did he ever acquire, hold, have, or own any right, title, interest, or estate whatsoever either legal or equitable in or to said listed lands or any part of said listed lands." It is then found that, on the 7th of February, 1911, when defendant filed his application to purchase said lands, "all of said lands were vacant public lands belonging to the state of California, and subject to sale under the laws of the state," and the findings detail the steps taken by defendant in making his filing.

The judgment, which followed the findings, decreed that the surveyor-general approve each of the applications of defendant and, upon further compliance by defendant with the laws relating to the sale of lands, that there be issued to defendant such further evidence of title as is provided by law.

The whole controversy presented by this appeal hinges, it will be observed, on the solution of the question whether the appellants or the grantors of their testator lost their rights by virtue of the asserted repeal of the statute of 1852 by the later legislation respecting the disposal of the lands embraced within the five hundred thousand acre grant by Congress. The real point of divergence between the parties is upon the question whether the locations of the Jackson warrants were legally made.

The statue of 1852 was entitled, "An Act to provide for the disposal of the 500,000 acres of land granted to the State by Act of Congress" (Stats. 1852, p. 41), and the first section thereof contained the following provision:

"Sec. 1. The Governor of this State is hereby authorized to issue land warrants for not less than 160 and not more than 320 acres in one warrant, to the amount of 500,000 acres, which warrants when so signed and issued by the Governor, shall be countersigned by the Controller, and by him be de-

posited in the office of the Treasurer of State for sale, charging the same to account of the Treasurer.''

Section 2 provided for the sale of warrants by the treasurer at the rate of two dollars per acre. Sections 3 and 14 of said act read as follows:

''Sec. 3. The parties purchasing such warrants and their assigns are hereby authorized in behalf of this State to locate the same upon any vacant and unappropriated lands belonging to the United States within the State of California subject to such location, but no such location shall be made unless it be made in conformity to the Law of Congress, which law provides that not less than 320 acres of land shall be granted in a body.''

''Sec. 14. So soon as the lands which may be located under and by virtue of the provisions of this act shall have been surveyed by the United States, and such locations are made to conform thereto, the Governor of this State shall cause patents to be issued in such manner and form as the Legislature may hereafter direct.''

A review and an analysis of the subsequent legislation with respect to the disposal of the five hundred thousand acre grant are correctly presented in the opening brief of the appellants as follows:

''On April 30, 1857, the legislature passed an act in reference to the location of warrants issued under the act of 1852, and the issuance of patents for the lands located thereunder entitled, 'An Act authorizing the location and patenting of school lands' (Stats. 1857, p. 356), section 1 of which provides:

'' 'Sec. 1. In all cases in which the lands of the United States have been duly surveyed by the general government, and the plat thereof shall have been on file thirty days in the land office of the proper district, it shall be lawful for the owner or owners of school land warrants, issued under the provisions of the act of this State, passed May 3d, 1852, in relation to the disposal of the 500,000 acres granted by the act of Congress of 4th September, 1841, to locate the same according to the legal subdivisions of the public lands, by filing a written application by such owner or owners, specifically describing the tract so located, with the Register of the United States Land Office for the proper district, accompanied by an affidavit of the party or parties

applicant, and of one or more witnesses, that there is no valid claim existing upon the land so desired, adverse to the claim of the person making such application for location.'

"On the 10th of April, 1858, the legislature passed an act creating a 'State Land Board for the State of California,' and designating its chief officer as 'the Register of the State Land Office,' and constituting the surveyor-general *ex-officio* register until otherwise provided. (Stats. 1858, p. 127.) This act prescribes with much particularity the duties of the register, and among them is that of keeping the record of all lands selected by the agents of the state of California as a portion of the five hundred thousand acre grant, showing the number of acres, the description of the land, the name of the original purchaser, the selecting or locating agent, the price per acre, and the numbers of school warrants under which the same are located.

"On the 23d of April, 1858, the legislature passed an act providing for the location and sale of the unsold portion of the five hundred thousand acres, and the seventy-two sections additional granted by the United States for the use of a seminary of learning. (Stats. 1858, p. 248.) By this act the Governor is authorized to appoint and commission in each of the United States land districts of the state, a locating agent, whose duty it is to locate unsold school lands and the seminary lands referred to, in the manner provided by law. The agents are required to proceed and obtain the consent of such settlers who may chance to avail themselves of the benefits of the act, and the request of others who are not settlers, and who may wish to purchase lands under its provisions, such consent or request to be accompanied by the affidavit of the parties and of two disinterested persons that there is no valid claim existing on the land adverse to theirs, and when such consent or request is obtained, under such forms as the Governor may prescribe, to apply to the register and receiver of their respective land offices to permit the location to be made in the name of the state, as a part of the grant above designated, and if permitted, to make the location in conformity with the laws and regulations of the United States.

"The twelfth section repeals the act of May 3, 1852, but declares that school land warrants then in circulation shall

be received for school lands and be located as then provided by law.

"On the 16th of April, 1859, the legislature passed an act for the issuance of patents for lands located under school land warrants, and for lands purchased under the act of April 23, 1858. (Stats. 1859, p. 338.) This act provides that in all cases where school land warrants have been issued under the act of May 3, 1852, and the same have been, or may be, located upon any of the public lands within this state subject to such location, and in accordance with the provisions of that act, or with the provisions of the act of April 30, 1857, or where parties have purchased under the act of April 23, 1858, and obtained a certificate of purchase from the registrar of the state land office, the holder of such warrant, or certificate of purchase, shall be entitled to receive a patent from the state for the lands thus located or purchased. The procedure for obtaining a patent is outlined in the act, and section 7 thereof repeals all acts, and parts of acts, conflicting with the provisions.

"Thereafter the legislature passed an act providing for the issuance of duplicate school land warrants in lieu of those lost, and on April 2, 1866, an act was adopted providing for the issuance by the register of the state land office of his certificate of the proper location of such warrant. (Stats. 1866, p. 854.)

"These acts were followed by the act of March 28, 1868, repealing all of the foregoing acts, providing a new and different procedure for obtaining patents to the unlocated portions of the five hundred thousand acres set apart as school land; providing further (sec. 54) that warrants issued in pursuance of the act to provide for the disposal of the five hundred thousand acres of land granted to the state by act of Congress shall be taken in payment of any part of said grant, provided that said warrant shall be paid directly to the register of the state land office, and shall be by him canceled before a certificate of purchase shall issue for the said lands; and also providing in section 71 of said act that all the various acts heretofore referred to shall be repealed, but that the provisions of said act 'shall not in any manner affect any legal or equitable claims, now existing on any of the lands hereinbefore described, in favor of any claimant under the State, nor affect any suit or proceeding which is

now pending respecting the same, arising out of any claims now made; but the courts of the state may proceed and adjudicate upon said rights, and patents or other evidences of title may issue for the same to the parties entitled thereto, under any existing laws of this state, the provisions of this act to the contrary notwithstanding.' (Stats. 1867–68, p. 507.)

"The act of March 28, 1868, in so far as the same relates to school lands, has since been amended in some particulars, but its main features were subsequently embodied in the Political Code of California, in sections 3494 to 3503, inclusive."

The contention of the appellants is that their rights were in no way impaired by the legislation prescribing the manner of the disposal by the state of the five hundred thousand acres of land granted to it by Congress following the enactment of the statute of 1852, but that their rights were preserved by said subsequent legislation and particularly by the saving clause contained in the statute of 1868, above quoted herein.

The specific argument of counsel for the respondent is that the locations made in 1893 could not have been valid locations, if attempted to be made under the act of 1852, for the reason that that act was repealed by the act of 1857, which provided "an entirely new procedure for the location of such land warrants"; that since, however, the appellants claim that, in making the locations, they followed the plan outlined by the statute of 1857 and not that prescribed by the statute of 1852, the inevitable result is that thus they "abandoned their claim to any protection under the act of 1852, so far as the same affected the procedure for locating lands under warrants issued under said act of 1852, and recognizing the right of the legislature to repeal said procedure or to enact any other provision in relation to such land warrants"; that the act of March 28, 1868, which expressly repealed all prior acts relating to this subject, "provided a new and different procedure for obtaining patents to the unlocated portion of the five hundred thousand acres granted to the state," and, therefore, to make the locations by Jackson valid, he should have followed the procedure laid down by said act of 1868.

[1] Replying to the above argument, we say, first, that the act of 1857 did not repeal the act of 1852 either expressly or necessarily from the general language thereof. To the

43 Cal. App.—25

contrary, it seems plain to us that the act of 1857 made certain portions of the act of 1852 a part of its own provisions, or, if it strictly cannot be said that this is true, it certainly and unquestionably recognized by express language the validity of the warrants issued under the prior act, the sale of such warrants and the rights acquired by purchasers of the same. It will be noted that the initial section of the act of 1857 provides that, when the lands granted to the state shall have been surveyed by the general government, and the plat thereof shall have been on file for thirty days in the land office of the district, it shall be lawful for the owner or owners of school land warrants, issued under the provisions of the act of this state passed May 3, 1852, to locate the same according to the legal subdivisions of the public lands, "by filing a written application by such owner or owners," etc., with the register of the United States land office "for the proper district," etc. [2] It is as obvious as any proposition can be that, far from intending to repeal the act of 1852 by the act of 1857, the legislature by the latter act merely intended to regulate the matter of locating warrants issued by the state and acquired by purchasers under the act of 1852, so that such locations would conform to the requirements of the United States statutes relative thereto. In other words, at the time of the passage of the act of 1852, none of the government lands in this state subject to location under the congressional grant of five hundred thousand acres had been surveyed, but the legislature assumed, nevertheless, that it could then dispose of the granted land according to the plan established by the act of 1852. (*Toland* v. *Mandell,* 38 Cal. 30; *McNee* v. *Donahue,* 142 U. S. 587, [35 L. Ed. 1122, 12 Sup. Ct. Rep. 211, see, also, Rose's U. S. Notes].) The earlier California cases (see, for instance, *Doll* v. *Meador,* 16 Cal. 315), held that the method of selecting and locating the unsurveyed granted lands as prescribed by the statute of 1852 was not inconsistent or in conflict with the act of Congress, but later on a different view was taken of that proposition, the supreme court finally declaring and deciding that the granted lands could not be selected or located until they were surveyed by the United States, and that if other rights to the lands should be acquired by pre-emption, homestead, etc., before such survey, the pre-emptioner or homesteader would be entitled to the land. It was further held that in a

case where two land warrant selections or locations were made on the same land, one prior to and the other subsequent to the survey, the later location would prevail. (See *Terry* v. *Megerle,* 24 Cal. 609, 624, [85 Am. Dec. 84]; *Grogan* v. *Knight,* 27 Cal. 515; *Hastings* v. *Devlin,* 40 Cal. 358; *People* v. *Jackson,* 62 Cal. 548.) It was because of the situation so arising that the legislature of 1857 passed the act of that year, the evident purpose thereof being, as stated, among other things, to preserve the legal integrity of the warrants issued and sold under the act of 1852, said act of 1857 providing, as seen, a method for locating said warrants on surveyed lands, as required by the act of Congress. But, as further showing not only an intention but a determination on the part of the state to protect the rights of purchasers of warrants issued under the act of 1852, and whose validity is expressly recognized by the act of 1857 and intervening subsequent acts, we may refer to the fact that, in 1866, to correct the difficulties the state found itself up against prior thereto, created by its legislation relative to the disposal of the granted lands, resulting in legally improper selections, the legislature memorialized Congress to pass what in effect might be termed a corrective act, the effect of which was to confirm to the state all selections of the granted lands made by the state, in good faith, and sold by the state in good faith, and the Congress thereupon passed an act, on July 23, 1866, confirming, not all the lands which had been selected by the state, but only such lands as had been *selected and sold* to purchasers, in good faith, under the laws of the state. This act of Congress "had the effect," said the supreme court, in *Toland* v. *Mandell,* 38 Cal. 30, 43, "to legalize the possession of locators upon unsurveyed lands under the state, until they should have opportunity to present their claims for determination by the officers of the United States, as therein provided. Thereafter, their claims ceased to be within the rule of *Grogan* v. *Knight,* 27 Cal. 515, for they were, by the act, admitted to all the rights and privileges of pre-emptors upon unsurveyed lands, under the laws of the United States, which are comprised in the right of present possession, coupled with the right to purchase the title whenever the time at which a purchase can be effected shall have arrived."

. The above decision was followed by the case of *Roberts* v. *Columbet,* 63 Cal. 22, where the appellant purchased from the state a school land warrant issued under the statute of 1852, and located the same in 1853, prior to the time that the land had been by the United States surveyed and listed to the state. The claim was that the location was invalid, but the supreme court held that the purchase by the appellant was in good faith and came within the confirmatory act of Congress, above referred to. The court, *inter alia,* said: "Since the passage of the act [of Congress] of July 23, 1866, we think that the position of the appellant has been essentially the same as it would have been if the land upon which he located his warrant had been, before the date of such location, surveyed by the United States."

From the foregoing considerations, it is entirely clear that the legislature did not intend by the act of 1857 to repeal the act of 1852, in so far as were concerned the rights acquired by purchasers of warrants issued by authority of the last-named act, assuming for the sake of the present discussion that the legislature possessed the power to abrogate the rights so acquired by a repeal of the statute, or at all. Indeed, it is clearly manifest, from an examination of all the legislation covering the subject of the disposal of the granted lands in question, from the statute of 1852 down to and including the act of 1868, the legislature on all occasions intended to and did take special pains to preserve and protect every vital right acquired by and invested in purchasers of school-land warrants under the statute of 1852. **[3]** The act of April 23, 1858 (Stats. 1858, p. 248), did expressly repeal, among others, the statute of 1852, but it contained the provision that "all school-land warrants, *now* in circulation, shall be received for school lands, and may be located *as now* provided by law." (Italics ours.) The meaning of this language, it is clear, is that school-land warrants in circulation at the time of the passage of the act of 1858 may be located as provided by law existing at the time of the passage of said act; or as provided by the law authorizing the issuing and sale of such warrants. And so, in every act passed by the legislature between the time of the passage of the act of 1858 and the time of the passage of the act of 1868, we find that the rights of the purchasers of these warrants were expressly recognized and preserved. It will, therefore, not be necessary to examine

herein in detail the several acts passed after the act of 1858, except the act of 1868. The important provisions of the several acts referred to are given above and plainly speak for themselves, and sustain the construction which, in a general way, we here ascribe to them.

The act of 1868 involved a general revision of the prior laws relating to school lands granted and belonging to the state and also an elaborate scheme for the disposal by the state of such lands. We shall not, nor is it necessary to the decision herein to do so, examine analytically the numerous provisions of that act. It is deemed sufficient to point out that it provides that the surveyor-general, who is by the act constituted the agent for the state for that purpose, shall locate the unsold portion of the five hundred thousand acre grant (sec. 11) ; that warrants issued in pursuance of the act of 1852 ''shall be taken in payment of any part of the said grant,'' subject to the condition that said warrants shall be paid directly to the register of the state land office and shall be canceled by him before a certificate of purchase shall issue for the said lands (sec. 54) ; that there shall be issued duplicate warrants in case of the loss or destruction of the originals, the duplicate to be of the same validity and have the same force and effect as the original (sec. 59). The act, as shown above, contains the clause saving pre-existing rights acquired in the lands.

In *Bludworth* v. *Lake,* 33 Cal. 255, decided before the passage of the act of 1868, the supreme court said, quoting the syllabus: ''When the state issues her land warrant and receives the sum of money required to be paid therefor, she thereby sells the amount of land specified in the warrant out of the five hundred thousand acres granted by the act of Congress, and authorizes the holder, as her agent, to locate the same upon any vacant lands belonging to the United States subject to such location. When this location is made, the locator thenceforth becomes the owner of the entire beneficial interest in the particular tract of land selected, and until the issuing of the patent the state holds the legal title in trust for the locator who has become the purchaser.'' This language can only mean that, while the particular tract or parcel of land out of the five hundred thousand acre grant so sold may not be known either to the state or the purchaser, at the time of the sale of the warrant, yet the amount of land

specified in the warrant is nevertheless sold to the purchaser by the state, and it remains with the purchaser to locate the warrant and thus acquire his right to a patent for the land so selected.

In view of the above-stated conclusion of the supreme court as to the legal effect of the sale of land warrants by the state issued by authority of the statute of 1852 or under any of the subsequent state legislation, of which conclusion the legislative branch of the state government is to be presumed to have had knowledge, particularly since the legislature had been for a number of prior years wrestling with the problem of a proper plan for the disposing of the government lands within its borders subject to location under state laws, it is (as counsel for appellants aptly suggest) inconceivable that the legislature would attempt, even if it had the rightful power to do so, to deprive holders of school-land warrants of the rights acquired and which they were authorized to exercise under prior statutes. But that the legislature intended to make no such attempt by the act of 1868, is plainly manifest, in our opinion, from the language of the several provisions of said act to which we have above referred. For instance, the act provides, as we have shown, that the surveyor-general, as *ex-officio* register of the state land office, shall act as the agent of the state for the location of the "*unsold* portion"—not the *unlocated* portion—of the five hundred thousand acre grant. By this language, the legislature expressly recognized and incorporated into the act of 1868 the doctrine laid down in *Bludworth* v. *Lake*, viz., that "when the state issues her land warrants and receives the sum of money required to be paid therefor, she *thereby sells* the amount of land specified in the warrant out of the five hundred thousand acres granted by the act of Congress."

[4] Thus it is clear to our minds that the legislature did not intend, as counsel for respondent contend is true, by the act of 1868, to vest solely and exclusively in the surveyor-general the right to make school-land warrant selections; for if, as the supreme court declared to be true, the sale of the warrant constituted a sale by the state of the number of acres of land specified in the warrant, then it was a sale of land so specified for all time and unconditionally; and there was, therefore, nothing remaining for the purchaser to do but to locate the number of acres his warrant called for. Having bought and

paid for the land, there was no reason why his warrant should be presented to the surveyor-general as in payment for something he had already paid for. This view is fortified by the consideration that section 59 of the act of 1868, as we have seen, in authorizing the issuance of duplicate land warrants, in cases where the originals had been lost or destroyed, provides: "Any person making application for a duplicate school-land warrant, in lieu of one alleged to have been lost or destroyed, shall make satisfactory proof, by affidavit of himself and others, to the register of the state land office, that the party applying therefor is a *bona fide* owner of such warrant, that the same has not been located, and of the facts establishing the loss or destruction of the same, and shall file with the register of the state land office a good and sufficient bond, in form joint and several, with two or more sureties, to be approved by said register, payable to the state of California, in double the value of said school-land warrant, conditioned that the said warrant alleged to have been lost or destroyed shall not be presented for location." It is further provided that the duplicate warrant shall be of the same validity, force, and effect as the original. The language, "shall not be presented *for location*," implies that the legislature recognized all the rights acquired by purchasers of land warrants under previous statutes—not only the right to the number of acres of land designated in such warrants, but to locate the warrants in the manner prescribed by the statute by whose authority they were issued and sold. Again, if the language referred to is not sufficiently clear and explicit in disclosing the intention to preserve to purchasers of such warrants any right acquired under the warrants as indicated above, then it seems to us that that intention is made absolutely clear and unquestionable by the provision requiring the person applying for the duplicate warrant to furnish a bond conditioned that the lost or destroyed warrant shall not be presented for location. "If," as counsel for the appellants well inquire, "the legislature had intended, as claimed, to cut off the right of anyone other than the surveyor-general to make school-land warrant locations, why did it exact a bond that the warrant represented to be lost or destroyed would not be presented *for location?* What need was there for this requirement? Manifestly, no such bond would have been required if the legislature had lawfully terminated the

right to use the warrant for any purpose other than *as payment* on an application to purchase land forming part of the five hundred thousand acre grant, and we are told by respondent's counsel that it did lawfully terminate all other rights. The state needed no protection against an unauthorized use of a warrant. It could snap its fingers at that and entirely disregard it. Viewed in this way the exaction of the bond was a useless and vain thing. But we must not assume that the legislature had an idle or senseless purpose in making this enactment; that it required a bond against doing an act which it said could not be done and which, if done, would have no validity or effect anyway." To our minds, the idea was to provide against the contingency of the loss or destruction of the written evidence—the land warrant—of rights acquired from the state by a purchaser of the warrant, by substituting a duplicate for the lost or destroyed warrant having "the same validity and the *same force and effect* as the original"—that is to say, a duplicate warrant preserving to the purchaser of the original himself or his assigns to locate such warrant on the number of acres of land sold to him by the state and specified in the warrant. Or, as the same proposition was stated in *Stuart* v. *Haight*, 39 Cal. 87, 89:

"The design evidently had in view in the enactment of the statute was to provide for the relief of those who had purchased state land warrants, which, in some way, had become unavailable to them for the purposes for which they had been issued by the state. The intention was to relieve from loss the holder of the warrant which had been issued by the state and acquired by the purchaser in the expectation of being able to locate it on the lands which had been granted to her."

[5] Summarizing the situation, then, it is: That the act of 1868 expressly limits the right of the surveyor-general to locate lands comprised within the grant by Congress to the unsold portion thereof; that, by the same act, duplicate warrants in lieu of those lost or destroyed, having the same validity, the same force and the same effect or (we may add) scope, are authorized to be issued upon sufficient affidavits and the filing of a bond that the originals will not be presented *for location;* that the effect of selling the warrants was to sell to the purchasers of the warrants the amount of lands specified in the warrants sold. From all these consid-

erations, we hold that it could not have been the intent of the legislature by the act of 1868 to deprive owners of pre-existing land warrants of the right themselves to locate said warrants as agents of the state.

[6]  It is true that the act of 1868 provides that outstanding warrants shall be taken in payment of any part of the grant, but, considering that provision in connection with the other provisions of the said act which we have already considered and construed, we are led to the conclusion that it was intended only to be permissive—that is to say, that it was intended to confer upon owners of outstanding warrants the right, in addition to their pre-existing right to locate the warrants as agents of the state, to present the same as payment on applications to purchase lands embraced within the congressional grant.  As we construe the provision, by comparison with other provisions of the act, it means this: That owners of such warrants may, in their discretion, present the same as payment on applications to purchase the lands, in which case the surveyor-general *shall* or *must* receive the same as such payment.  The object of the provision referred to probably was, as counsel for the appellants suggest, not to destroy the right of location in the owners of the warrants, ''but to hasten the redemption or cancellation of the outstanding warrants by allowing them to be used as cash,'' thus, as stated, giving a further or additional right to the owners of the warrants.

[7]  But, if there may be any question as to the correctness of the foregoing views regarding the matter in hand, a consideration of the saving clause of the act of 1868 will readily dissipate any doubt as to the proposition that, by said saving clause, the legislature intended to preserve to the purchasers of warrants issued and sold under the act of 1852 all the rights acquired by them by virtue of such warrants.  This clause, it will be remembered, follows language in section 71 of the act repealing some twenty-seven statutes relating to the public lands of the state and regulating the disposal thereof, and declares that ''the provisions of this act shall not in any manner affect any legal or equitable claims, now existing on any of the lands hereinbefore described, in favor of any claimant under the state,'' etc.

The contention of the respondent is, as to said clause, that it refers only to those rights under school-land warrants

which are vested—"that is, rights that arise out of the actual location of the warrants. In other words," further explains respondent, "the saving clause in the repealing words of the act of 1868 referred to accrued rights under located warrants and not to rights arising out of warrants still in circulation."

[8] But the first reply to this contention is that purchasers of school-land warrants issued and sold under the statutes of 1852 and 1853 acquired under such purchase vested rights (*Bludworth* v. *Lake, supra*)—that is, they thus acquired the indefeasible right to locate the warrants upon lands within the five hundred thousand acre grant. Indeed, the proposition may even be put in stronger form—they acquired a vested right to the amount of land specified in the warrants. The second reply to the construction respondent gives said clause is that, should it be sustained, it would be inconsistent with the provision in the statute that duplicate warrants should have the same validity, force, and effect as inhered in the originals. We have already shown that, while the legislature, prior to the enactment of the statute of 1868, had repealed the general procedure in the statute of 1852 for the disposal of the granted lands, it expressly preserved to purchasers of warrants issued under the latter act all the vital rights acquired by them under such purchases. (See said statutes, above cited and considered.) In adding to the statute of 1868 the saving clause under consideration, the legislature is to be presumed to have had in mind and considered the act of previous legislatures in preserving to purchasers of warrants under the statute of 1852 all the rights vested in them by and under the warrants sold by the state; and, therefore, reading, in view of that consideration, the language of the clause, "that the provisions of this act shall not in any manner affect any legal or equitable claims, now existing on any of the lands hereinbefore described, in favor of *any claimant* under the state," the conclusion would seem irresistibly to follow that the intent at the bottom of said clause was to preserve to such purchasers every right acquired by them by reason of the purchase—that is to say, not only the right to the amount of lands specified in the warrants, but the further right given by the statute under which they were issued and sold themselves to locate such warrants as agents of the state. To give the clause referred to any other construction would be to deny to the purchasers of such warrants

a substantial right and one which, it can well be said, entered vitally into the consideration upon which they purchased the warrants.

The specific purpose of a saving clause in a statute is to preserve pre-existing rights. "It is generally employed," says Mr. Sutherland in his treatise on Statutory Construction, section 225, "to restrict repealing acts; to continue repealed acts in force as to existing powers, inchoate rights, penalties incurred and pending proceedings, dependent on the repealed statute." (See, also, sec. 167 of the same work; Black on Interpretation of Laws, p. 270.)

The statute of 1852 did not limit the time within which the warrants issued and sold by its authority were to be used in the manner prescribed by said act. The act of 1868 made radical changes in the system for the disposal of state lands acquired by grant from the general government through its Congress, and the legislature, by the saving clause of the act of 1868, certainly intended to say to purchasers of land warrants that they were to be permitted to utilize their warrants in the manner and according to the plan or procedure established by the law from which they secured their rights to portions of the grant made by Congress to the state. This conclusion is not only reasonable, but eminently just.

Thus we think we have shown that the legislature, in the place of attempting to repeal by the act of 1868 the previous statutes relating to the public lands of the state so as to destroy the right of purchasers of land warrants issued under the authority of the previous acts to locate, as agents of the state, such warrants, intended by said act to preserve said right to such purchasers, and that thereby it did do so. But it is to be further suggested that, even if such attempt were made by the legislature, it would be wholly futile. [9] The sale of the warrants by the state constituted a contract between the state and the purchasers of the warrants. This is true, although at the time of the sale the lands granted by Congress had not been listed to the state. The terms of the warrant were that the purchaser was entitled to locate the same in behalf of the state of California. The warrant constituted a contract of sale of the amount of land specified therein and which land was embraced within the grant to the state by Congress of five hundred thousand acres of land. (*Bludworth* v. *Lake, supra.*)

[10] Whether the purchaser had ever exercised his right under the contract is a matter of no consequence. He might have delayed locating the warrant until the entire congressional grant had been exhausted, and thus have lost his rights under his warrants, but this consideration would render the sale and the purchase none the less a contract of sale of the amount of land specified in the warrant between him and the state. As heretofore herein declared, the right thus given the purchaser to locate the warrant in behalf of the state, or as the state's agent, constituted a vital element or covenant of the contract of sale. We do not say that the purchaser, after the passage of the act of 1868, was himself compelled to locate the warrant to complete his right to a patent, but we do say that he was vested with the right to do so or to take that course to obtain the actual benefits of his contract. The legislature was, therefore, without the power to take that right from the purchaser. To do so would be impairing the obligation of a contract, a power which is expressly denied to the state by the tenth section of article I of the federal constitution. The legislature may amend the procedure or change the remedy whereby rights are judicially asserted, and such amendment or change may have a retroactive effect, except in those cases where the procedure or the remedy as amended or changed directly affects and impairs the right. (See *James* v. *Oakland Traction Co.*, 10 Cal. App. 785, 792, [103 Pac. 1082], and authorities therein cited.) As shown, the act of 1868, as construed by respondent, although it may be regarded, as all the previous statutes might have been, as involving largely a procedural scheme for acquiring ownership of or title to lands comprised within the grant from Congress, would result in divesting purchasers of land warrants under previous legislative acts of the vested right to locate their warrants in behalf of the state.

The cases cited by respondent upon the proposition under consideration are not in point. The case of *Campbell* v. *Wade,* 132 U. S. 34, [33 L. Ed. 240, 10 Sup. Ct. Rep. 9, see, also, Rose's U. S. Notes], so cited, was where, under a Texas statute, the sale of a portion of the vacant lands of that state, lying within certain counties, was authorized, upon a survey of any of the said lands by the person desiring to purchase the same and upon the payment into the state treasury of the purchase money therefor, when it became the duty of the com-

missioner of the general land office, upon the presentation to it of the receipt for said purchase money, to issue to the purchaser a patent for the land. The proposed purchaser applied to the surveyor of the county to have the lands applied for surveyed, the applicant paying the required fees for the filing of the application; but no survey was ever made, and before the expiration of the time within which the surveyor was authorized to make the survey the legislature of the state withdrew from sale all of the public lands mentioned in the act under which the applicant applied to purchase the lands. An action by the applicant against the surveyor to compel the latter by mandate to survey the lands which the former sought to purchase was brought, and found its way to the United States supreme court, before which it was contended that the petitioner for the mandate, by his application for a survey, had acquired a vested right in the lands he desired to purchase which could not be impaired by their subsequent withdrawal from sale. The court held that the position of petitioner was clearly untenable, saying: ''The state was under no obligation to continue the law in force because of the application of anyone to purchase. It entered into no such contract with the public. The application did not bind the applicant to proceed any further in the matter, nor in the absence of other proceedings could it bind the state to sell the lands.''

The case of *Shiver* v. *United States,* 159 U. S. 493, [40 L. Ed. 231, 16 Sup. Ct. Rep. 54, see, also, Rose's U. S. Notes], merely holds that a person who has entered a homestead under the homestead laws upon lands of the United States does not acquire a vested interest in such lands by a mere entry upon the lands and continued occupation and improvement thereof.

The distinction between these two cases and the one at bar is obvious. And the case of *Messenger* v. *Kingsbury,* 158 Cal. 611, [112 Pac. 65], also cited by respondent, very clearly points out the distinction.

[11] Some discussion is had in the briefs of the long delay after their purchase in locating the warrants in question, it being intimated that by reason of such delay Jackson was guilty of laches in exercising his rights under the warrants. But we regard this position as of absolutely no consequence. The state was not, and could not have been, prejudiced by

the delay. No rights as against the owners of these warrants could accrue to the state by reason of the delay. The warrants, or the amount of land specified therein, had been fully paid for and the state had the money. Moreover, as before suggested, there was no time limit fixed by the statute of 1852 within which the locations were to be made. Besides, it is alleged in the complaint, and not denied, that the lands upon which the locations were made were certified and listed to the state by the United States on the twenty-third day of January, 1901, as a part of the five hundred thousand acre grant, and that said listing and certification "was made under and in pursuance of said locations of said Jackson, and not otherwise, and that ever since said last-mentioned date said state has held the legal title to said listed lands in trust for said Henry Jackson." It may further be suggested that it is alleged in the complaint, and not denied, that Jackson's locations in 1893 were made with the consent of the register and receiver of the United States land office at San Francisco, and were finally approved and allowed by the commissioner of the general land office in 1900.

Thus we have given this appeal extended consideration. Indeed, we have perhaps written more than might by some be deemed to have been necessary. But the main question, as well as some of the subsidiary points, are important, and the latter, we think, called for considerable attention.

Our conclusion is, as is indicated by the discussion, that the court below committed error in awarding judgment to the defendant; for it is clear to our minds that the facts found by the court show that the appellants are entitled to judgment. The judgment appealed from, as has been shown, rests entirely upon the alleged "finding" that there was no law existing in the year 1893, when the locations in question were made, authorizing such location or locations made in the manner that these were. That "finding" is, obviously, a mere conclusion of law, and, as has been at least inferentially stated, is not supported by the *facts* found. Accordingly, the judgment appealed from is reversed, with directions to the court below to enter a judgment for and in favor of the appellants upon the facts as found.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 29, 1919.

Angellotti, C. J., Shaw, J., Wilbur, J., and Lennon, J., concurred.