[Civ. No. 18052. Third Dist. Mar. 31, 1981.]

CALIFORNIA MEDICAL ASSOCIATION et al., Plaintiffs and Respondents, v.
JEROME LACKNER, as Director, etc., et al., Defendants and Appellants.

ROBERT J. PRENTICE, Plaintiff and Respondent, v.
JEROME LACKNER, as Director, etc., Defendant and Appellant.

Z. A. ADROUNY et al., Plaintiffs and Respondents, v.
JEROME LACKNER, as Director, etc., et al., Defendants and Appellants.

CALIFORNIA DENTAL ASSOCIATION et al., Plaintiffs and Respondents, v.
JEROME LACKNER, as Director, etc., et al., Defendants and Appellants.

**COUNSEL**

George Deukmejian, Attorney General, Thomas E. Warriner, Assistant Attorney General, Charlton G. Holland and John J. Klee, Jr., Deputy Attorneys General, for Defendants and Appellants.

Hassard, Bonnington, Rogers & Huber, David E. Willett, Rick C. Zimmerman, Maureen E. Corcoran, Wilke, Fleury, Hoffelt & Gray, Thomas G. Redmon, Davis, Cowell & Bowe, Geoffrey V. White and William T. Payne for Plaintiffs and Respondents.

## OPINION

**BLEASE, J.**—At issue in this appeal is the validity of a provision of the Medi-Cal reimbursement statutes (Welf. & Inst. Code, § 14077, eff. Sept. 22, 1976) which mandated the Director of the State of California Department of Health Services[1] (director) to establish a new, uniform schedule for reimbursing physicians and dentists for services rendered to Medi-Cal patients, retroactive to July 1, 1976.

We conclude that the legislation, insofar as it is retroactive, violates article IV, section 17 of the California Constitution, prohibiting payment of extra compensation to contractors for services already rendered, and article I, section 10 of the United States Constitution, prohibiting the impairment of contracts. We reverse the judgment mandating the director to apply his administrative schedules retroactively.

### FACTS

On September 22, 1976, Assembly Bill No. 4242 (1975-1976 Reg. Sess.) was signed into law as urgency legislation. (Stats. 1976, ch. 1207, § 2, p. 5494; codified, in relevant part, as Welf. & Inst. Code, §§ 14075-14080.) The legislation, intended to assure Medi-Cal recipients of reasonable access to medical care, required the Director of the State Department of Health Services to establish new reimbursement schedules for physicians and dentists providing services to recipients. It provides that the new, generally higher rates are to apply to services performed on or after July 1, 1976 (Welf. & Inst. Code, §§ 14077, 14078 [physicians]; Stats. 1976, ch. 1207, § 5 [dentists] [repealed, by its terms, eff. Jan. 1, 1978].)[2]

---

[1]At the time the statutes were enacted, the department was denominated the "Department of Health."

[2]Section 14077 provides: "Notwithstanding any other provisions of this chapter the director shall establish, within 15 days of the effective date of this act a statewide, uniform schedule for reimbursing physician services to Medi-Cal patients provided on or after July 1, 1976; except that, the director may establish physician reimbursement rates higher than the statewide rates for: (a) areas which the director determines to be medically underserved: and (b) other problems of equity in payment levels which adversely affect the accessibility of physician services to Medi-Cal recipients. Nothing in this section shall be construed to prevent the director from adopting physician reimbursement rates for primary care services and maternity care services which are relatively higher than the rates paid for other types of physician services." (Added by Stats. 1976, ch. 1207, § 2, p. 5494.)

Section 14078 goes on to provide: "The director shall establish, at the time he or she

The director promulgated such schedules shortly thereafter, but based on his reading of article IV, section 17 of the California Constitution, restricted application of the new rates to services rendered on or after September 22, 1976, the effective date of the legislation. (Cal. Admin. Code, tit. 22, § 51503, former § 51505, *filed Nov. 1, 1976*, Cal. Admin. Register 76, No. 45.)[3]

Various affected providers and professional associations brought suit to compel the director[4] to give effect to the retroactive increases called for in the statutes. The superior court granted a peremptory writ of mandate requiring the director to amend the regulations to make the new rates retroactively applicable to services rendered on or after July 1, 1976, and to pay any necessary incremental sums to providers reimbursed for such services under the old schedules. The director appeals.

I

The crux of this case is the legal relationship between the state and Medi-Cal providers. ■ The director contends that the relationship is essentially contractual, that physicians and dentists rendering services under the program are "contractors," and that retroactive application of higher or lower levels of payment to services performed between July 1

establishes the statewide rate for physician services required by section 14077, a level of reimbursement for physician services which represents at least an average increase over the statewide average amounts paid under the Medi-Cal program for the three-month period ending February 29, 1976, of 9.5 percent for all physician services except primary care services and maternity care services; of 20 percent for primary care services; and of 30 percent for maternity care services." (Added by Stats. 1976, ch. 1207, § 2, p. 5494.)

Section 5 of chapter 1207 of the Statutes of 1976 provided: "Notwithstanding any other provisions of this chapter, the director shall establish, within 15 days of the effective date of this act, a statewide, uniform schedule for reimbursing dental services to adult Medi-Cal patients provided on or after July 1, 1976. Such uniform, statewide schedule shall provide rates of reimbursement for dental services at a level equal to the statewide average paid amount for such services rendered to children under the Medi-Cal program during 1974. [¶] This section shall have no force or effect after January 1, 1978."

[3]This action antedated the adoption of article III, section 3.5, subdivision (a), of the California Constitution, which prohibits administrative agencies from refusing to enforce a statute "on the basis of it being unconstitutional unless an appellate court has made [such] a determination . . . ."

[4]Jerome Lackner, M.D., was the director when the actions were brought in the superior court. The parties subsequently stipulated that Beverlee A. Myers might be substituted for him as the respondent Director of Health Services.

and September 22, 1976, would contravene, respectively, article IV, section 17 of the California Constitution,[5] prohibiting payment of extra compensation or allowances to state employees or contractors for services already rendered, or article I, section 10 of the United States Constitution, prohibiting legislative impairment of contracts. We agree.

The detailed features of the Medi-Cal program have been described elsewhere. (*Morris* v. *Williams* (1967) 67 Cal.2d 733 [63 Cal.Rptr. 689, 433 P.2d 697]; *California Assn. of Nursing Homes etc., Inc.* v. *Williams* (1970) 4 Cal.App.3d 800 [84 Cal.Rptr. 590, 85 Cal.Rptr. 735].) We examine here the nature of the obligation of the state to reimburse Medi-Cal providers for services rendered to Medi-Cal patients.

Section 14019.3 of the Welfare and Institutions Code provides in part: "Upon presentation of the Medi-Cal card or other proof of eligibility, the provider shall submit a Medi-Cal claim for reimbursement, subject to the rules and regulations of the Medi-Cal program. Payment received from the state in accordance with the Medi-Cal fee structures shall constitute payment in full. . . ."

The director is authorized under Welfare and Institutions Code section 14105[6] to prescribe the rules for payment of Medi-Cal services, within statutory requirements.

The director had promulgated, under the prior law, regulations (Cal. Admin. Code, tit. 22, former §§ 51503, 51505) which were in effect during the period July 1 to September 22, 1976. Director contends that the regulations amount to a promise by the state to pay physicians and dentists for services rendered to Medi-Cal patients at the rates set forth therein and that providers accepted the state's offer by obtaining Medi-

[5]Article IV, section 17 of the California Constitution declares in pertinent part: "The Legislature has no power to grant . . . extra compensation or extra allowance to a public officer, public employee, or contractor after service has been rendered or a contract has been entered into and performed in whole or in part, . . ."

[6]Welfare and Institutions Code section 14105, subdivision (a), provides in part: "The director shall prescribe the policies to be followed in the administration of this chapter, may limit the rates of payment for health care services, and shall adopt such rules and regulations as are necessary for carrying out, not inconsistent with, the provisions thereof. [¶] Such policies and regulations shall include rates of payment for services not rendered under a contract pursuant to Chapter 8 (commencing with Section 14200) of this part. Standards for costs shall be based on payments of the reasonable cost for such services. . . ."

Cal "provider numbers," necessary for billing purposes. (Cal. Admin. Code, tit. 22, § 51502) and by treating such patients.[7]

Former regulation section 51505 provided that dentists would be paid their "usual charges" up to the "limits specified in the Department's Schedule of Maximum Allowances ...." (Cal. Admin. Register 75, No. 32) much as present section 51506(a) provides reimbursement "not exceed[ing] charges made to the general public," subject to listed "maximum reimbursement rates." The new section merely provides higher maximum rates.

Former regulation section 51503 of the Medi-Cal regulations reimbursed physicians their "usual charges made to the general public," up to maximum rates determined by taking into account the individual physician's claim, his usual charges for the same procedure during the preceding six months ("Individual Profile"), charges in his geographical area ("Prevailing Geographic Area Profile"), and the relationship between the local charges and the 1964 California Relative Value Studies, a guide published by the California Medical Association to aid physicians in setting their fees and to provide a useful reference for insurance carriers and government agencies ("Broad Band Profile"). (Cal. Admin. Register 76, No. 10.) This variable maximum rate structure resulted in payment of different amounts of compensation to physicians in different

---

[7]California Medical Association challenges the contention that respondents have effectively assented to the state's offer by treating Medi-Cal-covered patients. It *alleges* that the department requires a physician to accept Medi-Cal reimbursement upon presentation of a Medi-Cal card, even if the patient concealed his eligible status and agreed to pay the physician his customary fee. (See Welf. & Inst. Code, §§ 14019.3, 14019.4.) Respondent argues that, far from creating a contract, the Medi-Cal program operates in such a situation to impair a contract between the physician and his patient.

We cannot credit respondent's unsupported assertion regarding the department's interpretation of the statutes. We note that a Medi-Cal regulation governing the collection of payment from beneficiaries appears to controvert the assertion: "A provider of service under the Medi-Cal program shall not submit claims to or demand or otherwise collect reimbursement from a Medi-Cal beneficiary ... for any service included in the Medi-Cal program's scope of benefits *in addition to a claim submitted to the Medi-Cal program*." (Italics added.) (Cal. Admin. Code, tit. 22, § 51002.) If respondent's assertion is true, the italicized words are mere surplusage. Even if true, such a requirement might be analogous to the legal incapacity of minors to enter into contracts (see 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, §§ 263, 266-267, pp. 227-230), if designed to protect Medi-Cal beneficiaries out of concern for their special vulnerability. There is obviously no "impairment" of a contract, the formation of which was prevented by law. Respondents are of course free to take measures aimed at assuring that their patients are financially responsible before rendering them services, so Medi-Cal patients may be presumed to have been treated with knowledge of their status. This amounts to an acceptance of the state's offer.

localities and to those whose practices were established in greater or lesser degrees. The present section 51503 establishes a uniform schedule of maximum reimbursement, consistent with the mandate of section 14077 of the Welfare and Institutions Code, with generally higher rates.

In *County of San Luis Obispo* v. *Gage* (1903) 139 Cal. 398 [73 P. 174], the Supreme Court considered whether a law providing for payment of specified sums annually toward the maintenance of each orphan, half-orphan, or abandoned child supported by a political subdivision of the state created a contractual relation between the state and the local entity. The court concluded that it did. "[I]t must be conceded upon principle that the obligation here in controversy is an obligation arising upon a contract. The state ... in effect promised to each county in the state that if it should thereafter maintain and support persons of a class mentioned in the act, the state would appropriate and pay to such county the sums of money therein stated. This was the equivalent of an offer upon condition, and upon the performance of the condition by any county the offer became a promise, and binding as such upon the state.... It may be conceded that there may be other obligations arising by operation of law which do not also come within the class of obligations arising from contract; but it must also be admitted that there are obligations which, in a certain sense, arise from the operation of law, and at the same time are in substance and effect contracts. The obligation here in question comes within this latter class. It arises from the operation of the act of 1880. The act itself, coupled with the subsequent performance of the conditions by the respondent, furnishes all the elements which are necessary to the formation and existence of an implied contract." (*Id.*, at pp. 407-408.)[8]

---

[8]Respondent dentists suggest that the court found that a contractual relation had been created for the "sound policy reason[]" of avoiding the harshness of the sovereign immunity rule. This view is based on a misreading of the decision. They cite *Taylor* v. *Board of Education* (1939) 31 Cal.App.2d 734 [89 P.2d 148] for the proposition that "sound policy reasons" must support a finding that a contractual relation has been created, but the court there merely observed that a legislative act will not be construed, in the absence of a clear legislative intent, to create a contractual relation if such a construction would "extinguish the power of the government completely to control the subject matter of the enactment ...." (*Id.*, at p. 742.) In that case, moreover, the clear legislative intent was that *no* contractual relation be created. (*Ibid.*) Respondents have not suggested that the power of the Legislature to control the provision of services to Medi-Cal patients is "completely ... extinguish[ed]" by a finding of a contractual relation which prohibits changes in the level of reimbursement *after services have been rendered.* Even where the relationship between state and a provider of services is established in part or in whole by statute or regulation, as with some public employment, "to

Respondents reply that, in *California Assn. of Nursing Homes etc., Inc.* v. *Williams* (1970) 4 Cal.App.3d 800 [84 Cal.Rptr. 590, 85 Cal. Rptr. 735], we rejected a contention that Welfare and Institutions Code section 14105 expressed a statutory offer which could culminate in a contract between the state and an offeree. (*Id.*, at p. 817.) We there invalidated a regulation governing rates of reimbursement of long-term care facilities under the Medi-Cal program because it was improperly promulgated. We rejected the nursing home's claim of a *statutory* contractual entitlement to retroactive payment of the "reasonable cost" of care.

We said: "A statute fixing government payments may amount to an offer which, when accepted by performance, culminates in a contract between the government and the offeree. (*County of San Luis Obispo* v. *Gage* (1903) 139 Cal. 398, 406-407 [73 P. 174].) [¶] Sections 14104 and 14105 ... do not express a *statutory* offer. They fix no scale of payment, but only a standard, i.e., reasonable cost, for an administrative regulation fixing a rate or rate formula. Despite the standard's verbal simplicity, its expression in a regulation involves '"highly technical matters requiring the assistance of skilled and trained experts and economists and the gathering and study of large amounts of statistical data and information."' [Citation.] To say that an increased rate is reasonable does not mean that the rate preceding it was unreasonable. The reasonable cost standard allows so many variables that administrative implementation is indispensable to the creation of financial claims in specific amounts. The *statutes* do not amount to an offer in the contractual sense." (Italics added.) (*Williams, supra*, 4 Cal.App.3d at pp. 817-818.)

*Williams* does not support the respondents' claim. Rather, it suggests that the administrative *regulations* implementing the statutory policy, not the statutes themselves, express the contractual offer upon which are created "financial claims in specific amounts."

■ Here, of course, we deal with regulations. We conclude that they "amount to an offer which, when accepted by performance, culmi-

---

the extent services are rendered under statutes or ordinances then providing mandatory compensation ... the right to compensation vests upon performance of the ... work, ripens into a contractual obligation of the employer, and cannot thereafter be destroyed or withdrawn without impairing the employee's contractual right. [Citations.]" (*Longshore* v. *County of Ventura* (1979) 25 Cal.3d 14, 23 [157 Cal.Rptr. 706, 598 P.2d 866].)

nates in a contract between the government and the offeree. [Citation.]" (*Williams, supra*, at p. 817.)

Respondents next claim, incident to their *statutory* argument, that no *fixed rate* of reimbursement is established which, they imply, is necessary for the creation of a contract. It is true that the amount of reimbursement to be received by a provider was actually determined by the state or its fiscal intermediary upon receipt of the claim after the services were rendered. ■ The proper analysis whether a contract is created in such a situation is outlined in Professor Corbin's treatise: "An agreement that provides that the price to be paid, or other performance to be rendered, shall be left to the will and discretion of one of the parties has been held not enforceable. This is supportable if the party having such discretion makes no real promise to pay or to perform. An illusory promise is no promise at all and is not a sufficient consideration for a return promise. But the fact that one of the parties reserves the power of fixing or varying the price or other performance is not fatal if the exercise of this power is subject to prescribed or implied limitations, as that the variation must be in proportion to some objectively determined base or must be reasonable." (Fns. omitted.) (1 Corbin on Contracts (1963) § 98, pp. 438-439.)

■ The *regulations* did not leave the fixing of rates to the uncontrolled discretion of the director. Rather, they established an "objectively determined base." The regulation covering dental services provided for payment in the amount of the dentist's "usual charges," up to stated maximum reimbursements. Similarly, the regulation for physicians measured reimbursement by the individual physician's "usual charges" and the charges of other physicians.

The state's offer, through the regulations, and the providers' acceptance of it, constituted an implied contract between them. (Civ. Code, § 1621.)

## II

Respondents alternatively contend that the statutory "reasonable cost" standard governing the director's exercise of his discretion in promulgating reimbursement schedules was an implied term of any contract between providers and the state and that, in enacting the 1976 legislation, the Legislature implicitly determined that the rates set by the director were unreasonable.

We first note that the "reasonable cost" standard was not the director's only legislative guide in exercising his discretion. He was also subject to important fiscal restrictions imposed by the Legislature: "In the first place, all actions of the Medi-Cal administrator are limited by the annual appropriations for health services. (*Morris* v. *Williams* [(1967)] 67 Cal.2d [733,] 749-750.) Secondly, a 1967 amendment to section 14105 added a clause authorizing the director to 'limit the rates of payment' for services. . . . There is no need to decide here whether the 1967 amendment extracts any vital ingredient from the reasonable cost standard. Suffice it to say that it manifests a legislative intent to compromise reimbursement rates if necessitated by fiscal limitations. (*Morris* v. *Williams, supra,* 67 Cal.2d at pp. 757-758.) [¶] The provisos attached to the annual Budget Act appropriations for the administrative expense of the Medi-Cal program form a third limitation. [(See Budget Act of 1976, Stats. 1976, ch. 320, item 288.)]" (*California Assn. of Nursing Homes etc., Inc.* v. *Williams, supra,* 4 Cal.App.3d at p. 819.) (See also Welf. & Inst. Code, § 14120 [control of costs].) The rate schedule promulgated by the director necessarily reflected an accommodation of the contending legislative policies of assuring Medi-Cal recipients of maximum access to mainstream medical care and protecting the public fisc.

This is not a case, then, like *Walker* v. *County of Los Angeles* (1961) 55 Cal.2d 626 [12 Cal.Rptr. 671, 361 P.2d 247], where county civil service employees were entitled to retroactive raises after a salary ordinance was invalidated which improperly held their salaries below the level of "prevailing wages" at which the county charter legally fixed their compensation. (*Id.,* at pp. 640-641.) Nothing in the 1976 legislation amounted to a repudiation of the director's exercise of his rate-setting discretion. The Legislature knew well that if it desired that Medi-Cal providers be better compensated for their services, it had to appropriate additional funds for that purpose. It did precisely that in the 1976 legislation. (Stats. 1976, ch. 1207, § 6.)

Moreover, even if the "reasonable cost" standard were a controlling term of the implied contract between physicians and the state, the Legislature's determination that "an increased rate [was] reasonable does not mean that the rate preceding it was unreasonable." (*California Assn. of Nursing Homes etc., Inc.* v. *Williams, supra,* 4 Cal.App.3d at p. 818.)

## III

Respondents make a related argument that the "reasonable cost" standard rendered reimbursement rates set by the director in the exercise of his discretion under Welfare and Institutions Code section 14105 "indefinite and subject to future determination" (see *San Joaquin County Employees' Assn., Inc.* v. *County of San Joaquin* (1974) 39 Cal.App.3d 83 [113 Cal.Rptr. 912] [county employees' salaries while negotiations were in progress under the Meyers-Milias-Brown Act]; *Goleta Educators Assn.* v. *Dall'Armi* (1977) 68 Cal.App.3d 830 [137 Cal.Rptr. 324] [public school employees' salaries during negotiations under the Winton Act]; 23 Ops.Cal.Atty.Gen. 271 (1954); 33 Ops.Cal. Atty.Gen. 143 (1959); 39 Ops.Cal.Atty.Gen. 200 (1962); 47 Ops.Cal. Atty.Gen. 61 (1966); 56 Ops.Cal.Atty.Gen. 461 (1973)), so that the subsequent increase was not "extra compensation or extra allowance" within the contemplation of article IV, section 17 of the California Constitution.[9]

Respondents do not suggest that the Medi-Cal statutes, as they stood before September 22, 1976, explicitly authorized the promulgation of regulations with retroactive effect. They urge, however, that such authority is implicit in the "reasonable cost" standard. We disagree. We have already noted that the standard was not of overarching significance in the director's exercise of his rate-setting discretion, in view of the stringent fiscal constraints imposed on it by the Legislature. Mindful of this, we are hesitant to ascribe to the standard the singular effect of making the Medi-Cal fee structures for compensating physicians and dentists, payment in accordance with which is "payment in full" for their services (Welf. & Inst. Code, § 14019.3), merely tentative and subject to modification after such services have been rendered. (Cf. *T.W.A.* v. *Civil Aeronautics Board* (1949) 336 U.S. 601, 604-606 [93 L.Ed. 911, 915-916, 69 S.Ct. 756].[10] Moreover, the Legislature pro-

---

[9]The provision reads in its entirety: "The Legislature has no power to grant or to authorize a city, county, or other public body to grant, extra compensation or extra allowance to a public officer, public employee, or contractor after service has been rendered or a contract has been entered into and performed in whole or in part, or to authorize the payment of a claim against the State or a city, county, or other public body under an agreement made without authority of law." It was approved in the statewide election of November 8, 1966, succeeding, without any change in meaning, section 32 of the same article, which was repealed.

[10]In *California Assn. of Nursing Homes etc., Inc.* v. *Williams* (1970) 4 Cal.App.3d 800 [84 Cal.Rptr. 590, 85 Cal.Rptr. 735], we did not have to decide whether the director had standing authority to adopt rate regulations with retroactive effect. We considered apt, however, certain federal decisions involving the administrative fixing of

vided in section 14105 a specific procedure by which the director could, within 30 days after enactment of the state budget, adopt, as emergency regulations, new rate schedules reflective of the Legislature's budgeting decisions. This manifest concern for the speedy implementation of regulations reflective of the legislative mandate, combined with an eloquent omission to explicitly authorize the adoption of regulations with retroactive effect, convinces us that the Legislature did not intend the director's rate schedules for reimbursement of physicians and dentists to be "indefinite" and subject to retroactive modification.[11]

---

rates of compensation, based on "need," of air carriers transporting the mail. We observe in this connection that the Medi-Cal regulations in effect between July 1 and September 22, 1976, were not designated in advance as "temporary" by the director, so the cases cited therein which deal with retroactive modifications of such tentative "temporary" rates lend no support to respondents' position. (Cf. *Trans World Airlines, Inc. v. C.A.B.* (D.C. Cir. 1967) 385 F.2d 648; *American Overseas Airlines v. Civil Aeronautics Bd.* (D.C. Cir. 1958) 254 F.2d 744.) We need not decide whether, under the Medi-Cal statutes, the director had authority to promulgate such "temporary" rate schedules.

In this case, we are not concerned with Medi-Cal payments for inpatient hospital services, which are governed by Welfare and Institutions Code section 14106. That statute, which provides for payments based on "the lesser of reasonable costs, as determined by the director *in accordance with applicable federal law*, or the hospital's customary charges for such services," must be interpreted in light of a federal regulation requiring provision for retroactive adjustments of the administrative rates. (Italics added.) (See *Catholic Med. Cen. of Brooklyn & Queens, Inc. v. Rockefeller* (E.D.N.Y. 1969) 305 F.Supp. 1268.) There is no analogous federal regulation pertaining to reimbursement of individual physicians and dentists.

[11]The Supreme Court's decision in *Jarvis v. Cory* (1980) 28 Cal.3d 562 [170 Cal. Rptr. 11, 620 P.2d 598], that retroactive lump sum payments to state employees whose salaries were frozen in the fiscal year following the passage of the initiative measure denominated "Proposition 13" in June 1978 (Cal. Const., art. XIII A) did not constitute prohibited "additional compensation," is not inconsistent with this conclusion. In *Jarvis*, a "unique confluence of events" (*id.*, at p. 566) created "understandable uncertainty" (*id.*, at p. 576) on the part of state employees regarding their salaries. Thus, their position was analogous to that of the county employees in *San Joaquin County Employees' Assn., Inc. v. County of San Joaquin, supra,* 39 Cal.App.3d 83, and the teachers in *Goleta Educators Assn. v. Dall'Armi, supra,* 68 Cal.App.3d 830, while salary negotiations were going on; i.e., their salaries were not "fixed and certain." (*Jarvis*, at pp. 570-573.) Among the "numerous elements that converge[d]" to create such uncertainty were (1) the fact that, since the Governor vetoed the 2.5 percent raise voted by the Legislature, "salaries were determined by [the] provisions [of] the budget of the previous year, much as the interim salary levels in *San Joaquin* and *Goleta* were determined by the employment agreements of the previous year" (*id.*, at p. 574); (2) the Governor's veto announcement referred to the freeze as an "interim" measure (*ibid.*); (3) the term "freeze" itself denotes a temporary measure (*id.*, at p. 575); (4) diligent efforts were being made by the California State Employees' Association before the State Personnel Board and the Legislature to secure higher salaries (*id.*, at p. 576); and (5) the court's decision in *Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296 [152 Cal.Rptr. 903, 591 P.2d 1] (invalidating the

IV

Respondents California Dental Association and individual dentists (CDA) suggest that, even if the relationship between providers of Medi-Cal services and the state is contractual, they are not necessarily "contractors" within the meaning of article IV, section 17 of the California Constitution. The commission which drafted the provision commented that "[t]he effect of the section is to repudiate claims based on moral obligations arising out of services to the state or other governmental agency." (Cal. Const. Revision Com., Proposed Revision of Art. III, Art. IV, Art. V, Art. VI, Art. VII, Art. VIII, Art. XXIV of the Cal. Const. (1966)). Medi-Cal providers, respondents argue, fall outside the ambit of the constitutional provision because the services they provide are not rendered directly to the state, but to individual patients, and because the retroactive increases voted by the Legislature were not designed to discharge any felt moral obligation toward physicians and dentists rendering Medi-Cal services.

Of course, the term "contractor" is strictly applicable to anyone who enters into a contract, and sound reasons preclude any narrower construction of that term than common language usage would suggest. (*In re Quinn* (1973) 35 Cal.App.3d 473, 482 [110 Cal.Rptr. 881].) The constitutional provision was adopted, in part, to end abuses which had grown up with the Legislature's practice of making direct appropriations to individuals from considerations of gratitude, or charity, or felt moral obligations, and, in part, to relieve the Legislature from the importuning of individuals interested in obtaining such appropriation. (*Stevenson* v. *Colgan* (1891) 91 Cal. 649, 651 [27 P. 1089].) The provision thus protects the public fisc and insulates the Legislature from lobbying for retroactive benefits. These interests are no less applicable or important because the services provided by physicians and dentists are not rendered directly to a government agency. The Legislature's attempt to increase the reimbursement to providers for services already

---

Legislature's related attempt to void certain local employment contracts calling for salary raises) was a "perverse turn of events" the "cruel irony" of which must have been evident to the Legislature (*id.*, at pp. 576-577). The court made it abundantly clear that its holding was a narrow one, arising out of the peculiar factual situation presented there: "The conditions surrounding the passage of S.B. 91 are *sui generis*: we would be astonished to again see so many atypical events and forces combine to clearly demonstrate that wage levels, ostensibly rendered immutable by the Governor's action, still remain imprecise." (*Id.*, at p. 579.)

rendered in acceptance of the statutory offer then outstanding, which undoubtedly sprang from a justified conviction that they deserved to receive more in compensation than they did, was therefore clearly within the contemplation of the prohibition of additional compensation to "contractor[s]" in article IV, section 17 of the California Constitution.

## V

All the parties agree that if there is a contract created between Medi-Cal providers and the state, then any retroactive decrease in reimbursement to physicians due to the new, uniform schedules mandated by the 1976 legislation would be an unconstitutional "law impairing the obligation of contracts." (U.S. Const., art. I, § 10.)

We agree that such a decrease impairs the obligation of contracts since the obligation impaired would be the state's, no emergency exists to justify it, and the refunds sought from physicians would be irretrievably lost to them. (See *Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296, 305-308 [152 Cal.Rptr. 903, 591 P.2d 1].)

## VI

Respondent CDA stipulated that virtually all dentists submitted their Medi-Cal claims to and collected reimbursement from a designated fiscal intermediary, the California Dental Service (CDS). CDS processed dental treatment forms, approved dental services and paid dentists for services to Medi-Cal beneficiaries pursuant to a written contract with the state entered into on October 1, 1973, and renewed each year thereafter. The contract provisions pertaining to payment levels paralleled the Medi-Cal regulations, and the state schedule of maximum dental allowances was attached to the contract. In submitting their claims to CDS, dentists agreed to accept the reimbursements made under the contract as payment in full for their services.

Critically, the contract also provided for the eventuality of changes in the Medi-Cal regulations: "Any change in Medi-Cal benefits caused by changes of law or regulation shall not increase CDS' obligations under this agreement; however, CDS and the State shall, upon any such change, enter negotiations for an amendment to this agreement to con-

form to such changes and to provide for any change in costs caused by such amendment." Thus, the 1976 legislation had *no effect* on the CDS contract with the state or its obligations to dentists thereunder. The contract was amended by agreement of the parties effective October 1, 1976, incorporating into the contract a new schedule of maximum allowances for adult services. CDS had no legal or contractual obligation to pay greater reimbursements then were provided in the contract with the state until it was so amended.

## VII

Respondent CDA makes the extraordinary argument that, if the Legislature could not authorize retroactive payments for services performed on or after July 1, 1976, the higher rates should nevertheless be applied to services rendered after September 13, the date the Legislature passed Assembly Bill No. 4242, rather than September 22, the date the bill was signed into law by the Governor and took effect as an urgency measure. (Cal. Const., art. IV, § 8, subd. (a).) It was not until the legislation took effect, however, that the rate schedules according to which Medi-Cal providers contracted to furnish their services lost their binding effect, under the legislative mandate for increases in reimbursement. Thus, any increase for services provided between September 13 and September 22, 1976, would involve "extra compensation or extra allowance." (Cal. Const., art. IV, § 17.)

## VIII

The Medi-Cal regulations setting out new reimbursement schedules applied by their terms to services provided on or after September 22, 1976. (Cal. Admin. Code, tit. 22, § 51503, former § 51505, *filed Nov. 1, 1976*, Cal. Admin. Register 76, No. 45.) Their validity depended upon their consistency with the statutes under which they were promulgated (*Morris* v. *Williams, supra*, 67 Cal.2d at p. 737), and thus upon whether the void provisions are properly severable therefrom. Simply excising the words "provided on or after July 1, 1976" from the statutes unquestionably leaves statutes complete in themselves and which the Legislature would have adopted without the severed provisions. (See *Leaming* v. *Municipal Court* (1974) 12 Cal.3d 813, 816 [117 Cal.Rptr. 657, 528 P.2d 745]; *Board of Osteopathic Examiners* v. *Board of Medical Examiners* (1975) 53 Cal.App.3d 78, 85 [125 Cal.Rptr. 619].)

The Legislature clearly intended that the new rates be applicable to providers' services as soon as possible, within constitutional limits.

The judgment is reversed.

Evans, Acting P. J., and Carr, J., concurred.

The petitions of respondents California Medical Association and Adrouny et al. for a hearing by the Supreme Court were denied May 27, 1981. Tobriner, J., was of the opinion that the petitions should be granted.