[Civ. No. 19742. Third Dist. Feb. 26, 1982.]

STACY JO BROWN, a Minor, etc., et al., Plaintiffs, v.
GARY K. STEWART et al., Defendants and Respondents;
DEPARTMENT OF HEALTH SERVICES, Claimant and Appellant.

**COUNSEL**

George Deukmejian, Attorney General, Thomas E. Warriner, Assistant Attorney General, and Robert F. Tyler, Deputy Attorney General, for Claimant and Appellant.

Hardy, Erich & Brown, Robert Zimmerman, Wilke, Fleury, Hoffelt & Gray and Bradley N. Webb for Defendants and Respondents.

## OPINION

**CARR, J.**—The primary issue before us is the applicability of Civil Code section 3333.1 to Medi-Cal liens. The California Department of Health Services (Department) appeals from an order granting a motion to strike its lien in the underlying medical malpractice action filed by plaintiffs.

Subsequent to the filing of the complaint for professional negligence against the two doctor-defendants, Department, pursuant to statutory authority granted by Welfare and Institutions Code section 14124.70 et seq., filed in the action its notice of lien for $739 for ameliorative treatment provided to plaintiffs at public expense subsequent to the alleged substandard medical treatment.

Defendant Dr. Harmon Michelson filed a "Motion to Strike Notice of Lien or in the Alternative . . . Motion for Summary Judgment." He was joined in this motion by his codefendant Dr. Stewart. The motion was grounded upon a claim that the lien was invalid, in that Medi-Cal's right to claim reimbursement from the settlement of or judgment in a medical malpractice action had been abrogated by enactment of Civil Code section 3333.1. A secondary issue of procedural impropriety in noticing the lien was also asserted.

The trial court, without specification of grounds or reasons or even comments, at least in the record before us, granted the motion to strike. Inferentially, we must conclude the trial court found that section 3333.1 did indeed abrogate Medi-Cal lien rights in medical malpractice actions and further that the motion to strike was timely and the appropriate procedural device to remove the lien. Both findings are erroneous, requiring reversal, though consideration of the latter issue is not essential to the ruling herein.

■ The statute in question was enacted in 1975 as part of the 'Medical Injury Compensation Reform Act' (Stats. 1975, Second Ex. Sess., ch. 1, § 24.5, p. 3968, amended by Stats. 1975, Second Ex. Sess.,

ch. 2, § 1.19, p. 3990, Stats. 1976, ch. 1079, § 4, p. 4852), the Legislature's response to what was perceived as a crisis in the medical profession because of dramatic increases in the premium cost of malpractice insurance.[1] Section 3333.1 as finally amended provides: "(a) In the event the defendant so elects, in an action for personal injury against a health care provider based upon professional negligence, he *may introduce evidence of any amount payable as a benefit to the plaintiff as a result of the personal injury pursuant to the United States Social Security Act*, any state or federal income disability or worker's compensation act, any health, sickness or income-disability insurance, accident insurance that provides health benefits or income-disability coverage, and *any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the cost of medical, hospital, dental, or other health care services.* Where the defendant elects to introduce such evidence, the plaintiff may introduce evidence of any amount which the plaintiff has paid or contributed to secure his right to any insurance benefits concerning which the defendant has introduced evidence.

"(b) *No source of collateral benefits introduced pursuant to subdivision (a) shall recover any amount against the plaintiff nor shall it be subrogated to the rights of the plaintiff against a defendant.*" (Italics added.)

If perceived as a grand sweep, these provisions effectively annul, in medical malpractice actions, the collateral source rule firmly established in California law. As explained in *Hrnjak v. Graymar, Inc.* (1971) 4 Cal.3d 725, 729 [94 Cal.Rptr. 623, 484 P.2d 599, 47 A.L.R. 3d 224], "... the admissibility of evidence of plaintiff's receipt of collateral insurance benefits is not governed by specific statutory exclusion. Nevertheless, a pervasive public policy has been judicially expressed and California remains a firm proponent of the 'collateral source rule.' [Fn. omitted.] This doctrine provides that if an injured party received some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted

---

[1]The Governor, in his proclamation convening the Legislature in a Second Extraordinary Session declared: "The cost of medical malpractice insurance has risen to levels which many physicians and surgeons find intolerable. The inability of doctors to obtain such insurance at reasonable rates is endangering the health of the people of this State, and threatens the closing of many hospitals. The longer term consequences of such closing could seriously limit the health care provided to hundreds of thousands of our citizens...."

from the damages which the plaintiff would otherwise collect from the tortfeasor."

In noting the court's adherence to the collateral source rule had been reaffirmed in *Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1 [84 Cal.Rptr. 173, 465 P.2d 61, 77 A.L.R.3d 398], and *Acosta v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 19 [84 Cal.Rptr. 184, 465 P.2d 72], the court repeated the rationale for such rule as expressed in *Helfend*, supra: "The collateral source rule as applied here embodies the venerable concept that a person who has invested years of insurance premiums to assure his medical care should receive the benefits of his thrift. [Fn. omitted.] The tortfeasor should not garner the benefits of his victim's improvidence. [¶] The collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and other eventualities . . . ." (2 Cal.3d at pp. 9-10.)

Significantly, the emphasis by the court is on collateral benefits received by an injured person from a source to which such person has contributed by way of premiums or otherwise.

Department concedes the effect of section 3333.1 in covered cases is to abrogate the rule that evidence of collateral benefits may not be introduced and the usual result is any such benefits are not included in any damage verdict. However, Department reasons that only those benefits specified in subdivision (a) are affected; that Medi-Cal payments are not includable within any of the enumerated categories, and are not a collateral source contemplated by the Legislature as within the ambit of operation of section 3333.1. This conclusion is predicated on the assertion that Medi-Cal benefits are 1) not payable as a benefit to the plaintiff-beneficiary; 2) are not payable pursuant to a "contract"; 3) are not paid by an "organization"; 4) are not paid pursuant to the Social Security Act; 5) that Department is not a subrogee within the meaning of section 3333.1, and 6) section 3333.1 must be construed to harmonize with other relevant statutes. We consider these contentions, though not necessarily in order of briefing.

Our determination of whether Medi-Cal liens are encompassed within section 3333.1 must necessarily start with the legislative history and intent. The Governor's Proclamation which delineated those matters to be acted upon by the Legislature at the 1975 Second Extraordinary Session included in addition to discipline and certification matters, sev-

eral actions aimed at reducing the size of medical malpractice judgments, which inferentially would result in a reduction of insurance premiums for medical service providers. These were voluntary binding arbitration, limits on the amount of contingency fees charged by attorneys, limitation in the compensation recoverable for pain and suffering and "Elimination of double payments ('collateral sources')." (Stats. 1975, Second Ex. Sess., p. 3947.) The clear intent was to prevent a double recovery by plaintiffs of medical expenses and disability income payments received from other sources. This preclusion of double recovery was to be accomplished not by prohibiting recovery of such sums by plaintiff, but by allowing the fact-finder to receive and consider such evidence with the hopefully predictable result that such fact-finder would exclude these payments in computing damages,[2] and by prohibiting the source of collateral benefits from reimbursement either from the plaintiff or as a subrogee of the plaintiff from the third party tortfeasor.

The collateral benefits for which repayment is prohibited are divided into two general classes. The first is "any amount payable as a benefit to the plaintiff . . . pursuant to the United States Social Security Act, any state or federal income disability or worker's compensation act, any health, sickness or income-disability insurance, accident insurance that provides health benefits or income disability coverage." The second is any sums paid pursuant to "any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the cost" of health care services.

### MEDI-CAL PAYMENTS AS AN AMOUNT PAYABLE AS A BENEFIT TO PLAINTIFF PURSUANT TO THE UNITED STATES SOCIAL SECURITY ACT

In 1965, the Congress of the United States enacted as title XIX of the Social Security Act (42 U.S.C. § 1396, et seq.) the "Medicaid" law, which authorized federal financial support to states who adopted conforming medical assistance programs. Significantly, Medicaid programs are not now and never have been fully federally funded. The present plan is in a matching funds basis as provided in 42 United States Code section 1396a, which states as pertinent herein: "(a) State plan for medical assistance must—. . . .

---

[2]An example of this hope fulfilled is *Hrnjak* v. *Graymar, Inc., supra,* 4 Cal.3d 725. Presumably, under the statute at issue, a kind and generous jury could include any collateral benefits in its award, and even in a medical malpractice action, the plaintiff could recover what has been characterized by some as a windfall.

"(2) provide for financial participation by the State equal to not less than 40 per centum of the non-Federal share of the expenditures under the plan ... and, effective July 1, 1969, provide for financial participation by the State equal to all of such non-Federal share or provide for distribution of funds from Federal or State sources, for carrying out the State plan, on an equalization or other basis which will assure that the lack of adequate funds from local sources will not result in lowering the amount, duration, scope, or quality of care and services available under the plan."

Title 42 United States Code section 1396 authorizes annual appropriations by Congress to enable each state to furnish medical and rehabilitation assistance to the needy and specifically states that "sums made available under this section shall be used *for making payments to States* which have submitted, and had approved by the Secretary of Health, Education, and Welfare, State plans for medical assistance." In response to this federal legislation, the California Legislature enacted the Medi-Cal Program (Welf. & Inst. Code, § 14000 et seq.) to be administered by the state with partial funding from the federal government, and to provide basic and extended health care services for recipients of public assistance and medically indigent persons.

We conclude payments to recipients under the Medi-Cal program are not "any amount payable as a benefit to the plaintiff pursuant to the United States Social Security Act." First, the funds provided are paid to the State of California, to be administered as part of its program of providing medical care for the needy. To qualify for such financial assistance, the state must qualify by compliance with requirements of the federal law. Second, Medi-Cal payments are made directly to the medical service providers upon proof of rendition of health care services to an eligible Medi-Cal beneficiary. In a technical sense, a benefit is conferred upon the Medi-Cal recipient by the receipt of medical services but the thrust of the statutory language is directed to sums payable to the plaintiff.

Defendants urge that the direct payment to health care providers under Medi-Cal is of no significance as private health care plans such as Blue Cross, Blue Shield, and the Foundation Health Plan of Sacramento also pay directly according to an agreed upon schedule. This facile argument ignores that such private plans are specifically identified in the second contract providers clause of subdivision (a) of section 3333.1.

Defendants in a supplemental brief, argue that the earlier legislation proposed by Assemblyman Barry Keene in Assembly Bill No. 1 provided that any compensation awarded pursuant to the proposed law could, in the election of the health care provider, be reduced by the amount of any benefits to which the patient (plaintiff) had become entitled by reason of the loss, including any benefits payable under the Social Security Act, except those payable under titles XVIII (Medi-Care) and XIX (Medicaid—Medi-Cal in California); that the exceptions were deleted in the subsequent amended legislation, section 3333.1, and this evidences a legislative intent to encompass Medi-Cal payments within section 3333.1. However, when the Legislature took the language of Assembly Bill No. 1 (proposed Health & Saf. Code, § 21154.5) and transferred it to section 3333.1, a significant change was made in the prefatory language. The original draft provided for reduction in damages "by any benefits to which the patient is *entitled* by reason of the loss." (Italics added.) In section 3333.1, the Social Security benefits referred to are only those *payable as a benefit* to the medical malpractice plaintiff. If the Legislature had intended to include all forms of Social Security benefits *to which the patient was entitled*, irrespective of the person or persons to whom those benefits were payable, it would have retained the language in the original form. It did not. It substituted language stating directly that only those social benefits payable (directly) to the plaintiff were within the ambit of the act. Social Security programs, except for those contained in titles XVIII and XIX pay benefits directly to the recipient. The change in the prefatory language of the statute rendered superfluous the specific exemption of titles XVIII and XIX.

## MEDI-CAL PAYMENTS AS AN AMOUNT PAID PURSUANT TO A CONTRACT BY AN ORGANIZATION

The statutory reference to a benefit provided pursuant to "any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the cost of . . . health care services" applies typically to such private health care plans, as Blue Cross, Blue Shield, and the Foundation Health Plan of Sacramento. Defendants assert such terminology includes the State of California in the context of the Medi-Cal program, reasoning that the state is an "organization" which makes payments to health care providers pursuant to a contract or agreement to provide health care services. We conclude the suggested statutory interpretation is unsound.

In *California Medical Assn. v. Lackner* (1981) 117 Cal.App.3d 552 [172 Cal.Rptr. 815], this court considered the legal relationship between the state and those physicians and dentists who provide health care services to Medi-Cal recipients. We concluded that pertinent statutes and regulations amounted to an offer by the State to pay scheduled fees to physicians and dentists for services rendered to Medi-Cal patients and that by the act of providing services to a particular Medi-Cal patient the provider accepted the offer thereby forming an *implied contract.* (P. 561.) We adopted the language of *California Assn. of Nursing Homes etc., Inc. v. Williams* (1970) 4 Cal.App.3d 800, at page 817 [84 Cal.Rptr. 590, 85 Cal.Rptr. 735], and stated the administrative regulations implementing the statutory policy of section 14105 of the Welfare and Institutions Code "'amount to an offer which, when accepted by performance, culminates in a contract between the government and the offeree.'" (Pp. 560-561.)

In reliance upon *Lackner* defendants contend there exists a "contract or agreement" within the meaning of section 3333.1. This reliance is misplaced. The term "contract" in section 3333.1 refers not to an implied, unilateral contract between the payor and the provider of services as discussed in *Lackner*, but rather to an express, bilateral contract between the payor and the recipient of services.

Defendants assert the contractual relationship described in section 3333.1 is between the provider and the organization. A close review of the pertinent provisions of the statute discloses the focal point is what evidence may, at the option of the defendant, be offered. Section 3333.1, subdivision (a) provides a defendant "may introduce evidence of any amount payable as a benefit to the plaintiff ... pursuant to ... any contract or agreement of any ... organization ... to provide, pay for, or reimburse the cost of medical, hospital, dental, or other health care services."

Clearly, the statute permits a defendant to introduce evidence of a benefit payable to a plaintiff pursuant to a contract. The statute contemplates a contract to which the hypothetical plaintiff is a party and by which an organization agrees to either provide directly or pay for health care services, or to reimburse the plaintiff in the event he has expended personal funds for such services.

Defendants' interpretation of the statute as referring to a contract between the payor and the provider presumably could lead to the some-

what Alice in Wonderland application whereby an organization forms a contract with itself to provide health care services for the benefit of a plaintiff who is not a party to a contract for such services. We therefore conclude the only reasonable interpretation of the statutory reference to a contract is of a contract which includes as a contractual party the recipient of those health care services. Had the Legislature intended Medi-Cal to be covered by the statute in question, it could have accomplished this by so providing in the first clause of subdivision (a) where it would logically fit, rather than in the second clause, where it fits if at all, only by a tortured extrapolation of the statutory reference to an agreement or contract.

Moreover, the "contract or agreement" contemplated by section 3333.1 is unlike the implied contract discussed in *Lackner.* Defendants contend "that payments by the State of California to health care providers are made pursuant to *contract or agreement to provide, pay for, or reimburse* the cost of medical hospital, or other care services." (Italics added.) However, as we explained in *Lackner*, the implied contract is formed upon performance by the provider (i.e., providing the particular health care services). There is no preexisting "contract or agreement *to provide* ... services";[3] it is the actual providing of services which gives rise to the implied contract.

Defendants do not contend and we do not conclude there exists a contractual relationship between the state and Medi-Cal recipients.[4] We conclude that with respect to Medi-Cal no contract or agreement to provide health care services exists prior to the providing of such services and is not encompassed within the provisions of section 3333.1.

### CONSTRUCTION OF SECTION 3333.1 WITH OTHER RELEVANT STATUTORY ENACTMENTS

Courts should construe a statute with reference to the whole system of law of which it is a part so that all may be harmonized and have ef-

---

[3]Such terminology clearly connotes mutual promises to perform pursuant to an express bilateral agreement.

[4]We also reject defendants' construction of the term "organization" to include the state in the Medi-Cal context. Such an interpretation defies common sense. The first clause of subdivision (a) lists various assistance programs of both federal and state government; conspicuously missing is a reference to Medi-Cal. It is highly unlikely the Legislature would have intentionally placed such reference to the state program in the second clause, subtly ensconced between "group" and "partnership"—risking obscurity in "organization."

fect. Welfare and Institutions Code section 14124.71 et seq. specifically authorizes the director of the Department to recover against third party tortfeasors Medi-Cal payments either by lien or a direct action. To accept defendants' interpretation of section 3333.1 would create a direct conflict with the statutory recoupment sections.

The Social Security Act itself requires participating states in the Medicaid program to seek reimbursement for Medicaid payments from third party tortfeasors. Title 42 United States Code section 1396a (a)(25) provides: "(25) provide (A) that the State or local agency administering such plan will take all reasonable measures to ascertain the legal liability of third parties to pay for care and service (available under the plan) arising out of injury, disease, or disability, (B) that where the State or local agency knows that a third party has such a legal liability such agency will treat such legal liability as a resource of the individual on whose behalf the care and services are made available for purposes of paragraph (17)(B), and (C) *that in any case where such a legal liability is found to exist after medical assistance has been made available on behalf of the individual, the State or local agency will seek reimbursement for such assistance to the extent of such legal liability*; . . ." (See also 45 C.F.R. § 250.31(a).) (Italics added.)

We cannot presume the Legislature intended to enact a provision in violation of federal supremacy principles, and in Welfare and Institutions Code section 11003, specific provision is made whereby any state requirement relating to public assistance which does not conform to federal requirements is voided.

Moreover, we do not perceive it was the intent of the Legislature to bail out doctors and other health providers by the use of public funds. At the time of the enactment of the legislation in question, the Governor had made it clear he would not be willing to use general funds to pay for malpractice premium increases. (Keene, Medical Malpractice Crisis, p. 30.) But under the trial court's ruling, this precise result is accomplished. Acceptance of this interpretation means the state is required to forego its statutory right and federal obligation to collect monies to reimburse and thereby partially fund the Medi-Cal program in favor of reducing tort liability damage awards against health care providers and derivatively malpractice insurance premiums. Such a plan, in the absence of a direct public benefit, could be viewed as an impermissible gift of public funds (Cal. Const., art. XVI, § 6); at best, there is only an indirect benefit accruing to the public.

Finally, we note the Medi-Cal reimbursement statutes were revised and reenacted in 1976 subsequent to the enactment of section 3333.1 in 1975 (Stats. 1976, ch. 621, p. 1476). Though one purpose of the amendment was to clarify certain provisions governing attorneys fees, costs and notice, former section 14117 was reenacted as section 14124.74, which grants first lien rights to payments under the Medi-Cal program in any third party suit, whether the action or claim is prosecuted solely by the Medi-Cal beneficiary or jointly by the beneficiary and the director of the Department. The Legislature is presumed, in enacting or amending a statute, to be aware of former enactments. We cannot assume the Legislature in 1976 was not mindful of section 3333.1 enacted the previous year. (*Rosenberg v. Bump* (1919) 43 Cal. App. 376 [185 P. 218]; 58 Cal.Jur.3d, Statutes, § 92, pp. 446-449.) The reasonable assumption is if the Legislature had intended to preclude reimbursement of Medi-Cal payments by inclusion within section 3333.1, it would have explicitly so provided in either section 3333.1 or in section 14124.70 et seq.

## NOTICE OF LIEN PROCEDURE

■ Defendants asserted in the trial court and renew those assertions before us that Department's practice of filing and serving a notice of lien in the third party action is procedurally improper in that the reimbursement statutes allow for the perfection of a lien "In the event of judgment or award . . . ." on the application of the director (Welf. & Inst. Code, § 14124.74), which connotes a motion or its equivalent, which the court, in its discretion, may or may not grant. An analogy is made to the perfection of creditors' liens as set forth in Code of Civil Procedure section 688.1. Such analogy is inappropriate. Statutorily, reimbursement of Medi-Cal payments in third party suits or claims permit no judicial discretion. The only discretion to waive all or part of the lien rests with the director.[5] (Welf. & Inst. Code, § 14124.74, subd. (b); see *Wright v. Department of Benefit Payments* (1979) 90 Cal.App.3d 446, 449 [153 Cal.Rptr. 474].) The Medi-Cal claim for reimbursement is created by operation of law. No judgment, award or settlement in any action, or claim by a beneficiary may be satisfied without giving notice to the Director and allowing a reasonable opportunity to satisfy the lien. (§ 14124.76, Welf. & Inst. Code.) We perceive that no formal

---

[5]There is a statutory limit on such claims in Welfare and Institutions Code section 14124.78, of one-half the beneficiary's recovery after deducting attorneys fees, litigation costs, and medical expenses relating to the injury paid by the beneficiary.

■

procedure for perfecting the claim for reimbursement is necessary. The "Notice of Lien" procedure employed by the director accomplished its intended purpose of putting all parties on notice that the director is asserting a lien in the underlying proceedings.

The remaining peripheral issues raised by both parties need not be addressed.

The order granting defendants' motion to strike the notice of lien is reversed.

Puglia, P. J., concurred.

**BLEASE, J.**—I concur in the result.

I think it clear from a reading of the Medical Injury Compensation Reform Act and its legislative history that the collateral source provisions of section 3333.1 were meant to apply to the monetary value of medical services provided under the Social Security Act. However, the Social Security Act directs the state to "seek reimbursement for such assistance to the extent of . . . liability" of third parties. (42 U.S.C. § 1396a(a)(25).) Section 3333.1, as it applies to Social Security benefits, is in conflict with that requirement and is thereby rendered invalid by the supremacy clause of the United States Constitution.

## A.

The fallacy of the majority opinion lies in its distinction between Social Security *benefits* and Social Security *entitlements.* The majority read the collateral source provisions of Civil Code section 3333.1, subdivision (a), to apply only where Social Security "benefits" are in the form of money paid *directly to* the recipient.

To reach this result, the majority opinion severs out for distinct treatment the last clause of section 3333.1, subdivision (a), which applies to medical service contracts providing inter alia for services. The opinion says (*ante*, p. 337): "Defendants urge that the direct payment to health care providers under Medi-Cal is of no significance as private health care plans such as Blue Cross, Blue Shield, and the Foundation Health Plan of Sacramento also pay directly according to an agreed upon schedule. This facile argument ignores that such private plans are spe-

cifically identified in the second contract providers clause of subdivision (a) of section 3333.1."

The difficulty with the majority's rendering of section 3333.1 is that the term "benefits," which bears the entire weight of the argument, can only be read in context as inclusive both of direct payments *and* contracted-for medical services.

A simple parsing (by clause) of section 3333.1, subdivision (a), demonstrates the point. It says: "In the event the defendant so elects, in an action for personal injury against a health care provider based upon professional negligence, he may introduce evidence of any amount *payable as a benefit* to the plaintiff *as a result of the personal injury pursuant to* [A] the United States Social Security Act, [B] any state or federal income disability or worker's compensation act, [C] any health, sickness or income-disability insurance, accident insurance that provides health benefits or income-disability coverage, [D] and *any contract* or agreement of any group, organization, partnership, or corporation to *provide, pay for, or reimburse the cost of* medical, hospital, dental, or other health care *services....*" (Italics added.)

It can readily be seen that the term *benefit* is inclusive, not only of Social Security act "benefits," but also of disability, insurance and contract "benefits." Section 3333.1 is expressly applicable to "any amount payable as a benefit to the plaintiff as a result of the personal injury pursuant to [*both*] the United States Social Security Act ... *and* any contract ... to *provide,* pay for, or reimburse the cost of *medical* ... *services....*" (Italics added.) The use of the phrase "any *amount payable* as a benefit" does not limit the term "benefits" to *direct* payments to the recipient but is expressive of the fact that medical services bear a cost which must be paid.

The majority opinion draws sustenance from the legislative history of the act from which it extracts a distinction between social security *entitlements* and social security *benefits.* It says (*ante,* p. 338): "[W]hen the Legislature took the language of Assembly Bill No. 1 (proposed Health & Saf. Code, § 21154.5) and transferred it to section 3333.1, a significant change was made in the prefatory language. The original draft provided for reduction in damages 'by any benefits to which the patient is *entitled* by reason of the loss.' (Italics added.) In section 3333.1, the Social Security benefits referred to are only those *payable as a benefit*

to the medical malpractice plaintiff. If the Legislature had intended to include all forms of Social Security benefits *to which the patient was entitled,* irrespective of the person or persons to whom those benefits were payable, it would have retained the language in the original form. It did not. It substituted language stating directly that only those social benefits payable (directly) to the plaintiff were within the ambit of the act. Social Security programs, except for those contained in titles XVIII and XIX pay benefits directly to the recipient. The change in the prefatory language of the statute rendered superfluous the specific exemption of titles XVIII and XIX."

A full reading of the legislative changes belies this reading. As amended in Assembly on June 2, 1975, the provisions at issue were embodied in proposed Health and Safety Code section 21154.5.[1] It said that upon the election of a health care provider, the compensation award "shall be reduced by any benefits to which the patient . . . is *entitled* by reason of the law, including *benefits payable under the federal Social Security Act, except Titles XVIII and XIX thereof . . . .*" and certain workers' compensation and insurance benefits. (Italics added.)

Plainly, "benefits" are things *of entitlement,* not a separate species, and are inclusive of other than Social Security benefits. The term "entitled" bears no meaning peculiar to the Social Security laws and has no life independent of benefits. It is simply the predicate term for the receipt of benefits of various kinds.

The relevance of these meanings becomes apparent when the Assembly amendments to Assembly Bill No. 1 of June 6, 1975, are examined. On that day, proposed Health and Safety Code section 21154.5 became

---

[1]Proposed Health and Safety Code section 21154.5 provided: "In the event the health care provider so elects, compensation awarded pursuant to this chapter shall be reduced by any benefits to which the patient or his survivor is entitled by reason of the loss, including benefits payable under the federal Social Security Act, except Titles XVIII and XIX thereof, benefits payable pursuant to Division 4 (commencing with Section 3201) of the Labor Code, and insurance benefits, other than the proceeds of life insurance. In determining the amount of such insurance benefits for purposes of this section, insurance premiums paid during the 18 months immediately preceding the injury by or on behalf of the insured to secure the insurance benefits shall be deducted from the total of such benefits which the claimant has received or to which he is entitled. Where the health care provider elects to reduce benefits as provided in this section, the claimant may introduce evidence of insurance coverage of the health care provider against which damages may be assessed in the action and also evidence of previous settlement negotiations."

Civil Code section 3333.1, subdivision (b),[2] the forerunner of the present section. The latter section provided that malpractice damages "shall be offset by *any amount payable as a benefit to the plaintiff* as a result of personal injury *under the United States Social Security Act....*" (Italics added.)

The change in sections replaced the phrase "any benefits to which the patient is entitled" with "any amount payable as a benefit" as the predicate class within which are the enumerated kinds of benefits, inclusive of benefits secured both directly as cash and indirectly as services.

Section 3333.1 clearly applies to medical services provided under the Social Security Act.

However, section 3333.1 impermissibly trenches upon provisions of the Social Security Act having precedence by virtue of the supremacy clause of the United States Constitution. As the majority opinion emphasizes (*ante,* p. 341), "[t]he Social Security Act itself requires participating states in the Medicaid program to seek reimbursement for Medicaid payments from third party tortfeasors. 42 United States Code section 1396a(a)(25) provides: '(25) provide (A) that the State or local agency administering such plan will take all reasonable measures to ascertain the legal liability of third parties to pay for care and service (available under the plan) arising out of injury, disease, or disability, (B) that where the State or local agency knows that the third party has such a legal liability such agency will treat such legal liability as a resource of the individual on whose behalf the care and services are made available for purposes of paragraph (17)(B), and (C) *that in any case where such a legal liability is found to exist after medical assistance has been made available on behalf of the individual, the State or local*

---

[2]"(b) Any damages awarded to a plaintiff in an action for personal injury against a provider of health care services shall be offset by any amount payable as a benefit to the plaintiff as a result of the personal injury under the United States Social Security Act, any state or federal income disability or workmen's compensation act, any accident, health, sickness, or disability insurance, and any contract or agreement of any group, organization, partnership, or corporation to provide or to pay for or reimburse the cost of medical, hospital, dental or other health care services. The amount which is offset from the judgment shall be reduced by (1) any amount which the plaintiff has paid or contributed during the calendar year in which his right to benefits arose for any program, plan or policy under which benefits are payable and (2) if the program, plan, or policy was provided to the plaintiff by his employer as an employee benefit, an amount equal to any reasonable cost which would have been incurred by the plaintiff during the calendar year in which his right to benefits arose if he had personally paid for the program, plan, or policy."

*agency will seek reimbursement for such assistance to the extent of such legal liability: . . .'* (See also 45 C.F.R. § 250.31(a).) (Italics added.)"

Plainly, no reimbursement can be successfully sought where, by reason of section 3333.1, subdivision (b), "[n]o source of collateral benefits introduced pursuant to subdivision (a) shall recover any amount against the plaintiff nor shall it be subrogated to the rights of the plaintiff against a defendant." "State action must give way to federal legislation where a valid 'act of Congress fairly interpreted is in actual conflict with the law of the State.'" (Fn. omitted.) (Tribe, American Constitutional Law, p. 377, and cases cited therein.)

By this perhaps labored alternate route, I reach concurrence in the result of the majority opinion.

The petition of respondent Michelson for a hearing by the Supreme Court was denied May 27, 1982. Richardson, J., did not participate therein. Racanelli, J.,* participated therein. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.